## STATE v. ROWELL.

1. REHEARING granted.

2. EVIDENCE—INTOXICATION.—In homicide case evidence as to defendant being intoxicated a half-hour before homicide and of conversation between him and a third person on street tending to show intoxication is relevant.

3. IBID.—ON CROSS-EXAMINATION A PAPER alleged to have been signed by witness may be shown him, and portions of it read to him before jury and questions asked him about it without inspection by adverse attorneys, and putting it in evidence.

4. IBID.—INTOXICATION—THREATS.—DEFENDANT ON CROSS-EXAMINATION may be asked questions tending to show he was intoxicated immediately before homicide and that he had then threatened to kill another man.

5. JURY came into Court a second time and announced they could not agree. The Judge impressed on them in strong terms importance of an agreement. No unwillingness was expressed on part of jury to retire again. Some of the jurors asked the Judge to state again the law of self-defense. *Held,* not error to send them back to again assume consideration of the case.

6. SELF-DEFENSE.—A defendant in a homicide case does not deprive himself of the right to rely upon the plea of self-defense by using to deceased opprobrious words or by being guilty of a breach of decorum which *resulted* in an attack upon him, but only where a reasonable man would expect such words or acts to bring on a physical encounter.

7. IBID.—INSTRUCTION that a man is not allowed to kill another, if by running away he can get out of danger, is not error, under the facts of this case.

8. JURY.—Where Judge at once imparts publicly what juror says to him in private in Court room, it is no error, but practice of permitting juror to speak privately to Judge not commended.

9. IBID.—Without any misconduct on the part of a juror or of the constable in charge of the panel, an opinion as to the guilt of the defendant volunteered in presence of a juror by another constable should not induce the conclusion that the finding of the jury was influenced by it.

Before KLUGH, J., Florence, March Term, 1905. Reversed.

Indictment against William B. Rowell for killing Jos. C. Blount. From sentence on verdict, defendant appeals on following exceptions:

"I. The Court below erred in allowing the witness, G. S. O'Bryant, to testify, over the objection of the defendant, to the alleged condition of the defendant before the homicide, and to alleged conversations between said witness and one Speed, and an alleged conversation between said parties and the defendant, to wit: 'Q. What was his condition and what did he say? A. Mr. Speed and myself were walking— Q. What did either one of you say in his presence? A. Speed and myself were walking by and he was leaning upon a post. Q. Who was? A. Mr. Rowell. And when we got right near to him Mr. Speed was talking, and he said: "That is a damn lie; I don't believe a word of it." Q. You and Mr. Speed were walking along talking? A. Yes, sir. Q. Mr. Rowell was where? A. On the corner. Q. How was he doing? A. He was leaning up against the post there, in pretty bad shape. Q. You and Mr. Speed walking along talking? A. Yes, sir. Q. What did Mr. Rowell say? A. We were walking along talking, and when we got right near Mr. Rowell said: "It is a damn lie and I don't believe a word of it; and you are going to the blind tiger to get a drink."

Speed struck a match and held it in his face, and I said, "Oh, come on. It is Mr. Rowell, and he is drinking.' "

"(a) The same was irrelevant. (b) There was no connection between the same and the homicide. (c) It was an effort by the State to show other acts of misconduct on the part of the defendant, not connected with the homicide, to attack and blacken his character, and to prejudice the defendant in the mind of the jury.

"II. The Court below erred in holding as incompetent and ruling out the answer of the witness, Leon D. Morris, to the question, 'Do you know whether it was the custom of Mr. Blount to go armed?'

"(a) The testimony was admissible and (b) relevant as tending to establish self-defense.

"III. The Court below erred in allowing the solicitor to submit to the inspection of the witness, John L. Rogers, a paper purporting to have been signed by him, interrogating the witness as to the same and reading the same to witness and in hearing of the jury, without allowing the defendant's counsel the privilege of first inspecting the same, and in holding that the right did not exist unless the paper is offered in evidence. The Court should have held that submitting the paper to the inspection of the witness and then reading the alleged contents to the witness in the hearing of the jury did not confer this right, and was tantamount to the introduction of the same in evidence.

"IV. The Court below erred in holding as competent, over defendant's objection, and forcing the defendant while on cross-examination to answer the following questions by the solicitor, and in holding that the same was competent because it was the cross-examination, to wit: 'Q. While you were at Mr. Rouse's store, is it not a fact, Mr. Rowell, that you were so much under the influence of whiskey that your friend Mr. Rouse asked you to go home, and told you it was best for you to take a cup of coffee? Q. When Mr. Rouse advised you to do that, didn't you reply in substance in this way to Rouse: "You are a fool; you don't

know what you are talking about. A man in my position, a constable, could kill a man and not suffer as much as you think"? Didn't you use that expression, drinking, being under the influence of whiskey? Q. Very good. Did you not on this evening of the 16th of December, the same evening as this killing, at Tom Williams' blacksmith shop, about six o'clock, anyway, late that evening, about six o'clock, in the city of Florence, didn't you try to borrow twenty-five cents from Mr. Tom Williams, and didn't he refuse to lend it to you, telling you that you already had enough liquor? Q. Well, I am giving you notice we are going to contradict you. And in the same conversation, when Mr. Williams refused to let you have this money, didn't you go on and say that you intended to kill a man at the dispensary? Q. Very good. At Pendergrass's store, did you threaten right there to kill Nat Phillips? Q. Didn't Mr. Hollis put you out of the store? Q. And didn't you come back in, saying, "God damn him! I'll kill him!" alluding to Nat Phillips? Q. When Mr. Hollis put you out of the store, didn't you go out on the street and say, "I will stand here and get him!" or words to that effect? Q. Mr. Rowell, isn't it a fact—I will ask you again—that when you went in Pendergrass's store you were so much under the influence of whiskey, in addition to doing what I have already asked you about, that you spoke about being on the constabulary force and you had been discharged, and cursing around generally? Q. Hadn't you been discharged once or twice? A. Only once. Q. How long before that? A. It was during Governor McSweeney's administration. Q. Wasn't it for drunkenness? A. Yes, sir, it was.'

"(a) The same were irrelevant. (b) There was no connection between the same and the homicide. (c) They were efforts by the State to show other acts of misconduct on the part of the defendant, not connected with the homicide, to attack and blacken his character, and to prejudice the defendant in the mind of the jury. (d) The Court should have held that the privilege and license of cross-examina-

tion never permits the introduction of testimony otherwise positively incompetent and improper.

"V. The jury having returned to the court room twice and announced that they could not agree, the Court below erred in sending them back a third time and giving them the following charge: 'The Court: Mr. Foreman, is there any further matter in which the Court can give you assistance to enable you to arrive at a verdict? The Foreman: No, sir. The Court You don't desire any further instruction upon law? The Foreman: No, sir. The Court: Nor any portions of the testimony read? The Foreman: No, sir. The Court: It is simply a matter of inability of the jury to agree? The Foreman: Yes, sir. The Court: Well, that, to say the least of it, is a very unsatisfactory condition of things. It cannot satisfy the defendant or the State. I doubt very much whether it satisfies the jury. It certainly does not satisfy the Court. You are sworn to arrive at a verdict, and to render a true verdict according to the evidence. It sometimes happens that the jury is not able to do that, merely because there are twelve intelligent minds who have to deal with the facts of the case, and those twelve intelligent minds see the facts from different standpoints and arrive at different conclusions as to what are the facts of the case. After a jury, or anybody else, gets at the facts of a case it is a very simple matter to apply the facts to the law—for the law is fixed. It is not a question of what is the law, or whether you agree about the law, for there is no possibility of a disagreement about the law. So that it is a simple matter, if the facts of a case are ascertained, to apply those facts to the law, and render a conclusion, that is, in this instance, a verdict. But sometimes that turns out to be practically impossible. Because men have their views, they have their consciences, and men who are sworn on their solemn oaths to render a verdict according to the facts may not be able upon their good consciences to reconcile differences that arise amongst you and come to a common agreement or conclusion as to the facts of the case. I take it that

that is apparently what the trouble is now: that you have
not been able to agree amongst yourselves as to what are the
facts of the case, and, therefore, you are unable so far to
render a verdict in the case. Now, as I have said, you be-
ing intelligent men, good and lawful citizens, true men, no
doubt you are impressed with the unsatisfactory condition
of things that that presents. If you do not agree, it means
that this whole mater will have to be gone over again by
some other jury, who will be expected to agree; and there
is no human probability that that jury will be in any better
position to agree than you are. So it follows, then, neces-
sarily, that if it can be that this jury can come together and
agree on a verdict, you ought to do it. As I have said
already, a mistrial must be unsatisfactory to everybody. It
satisfies nobody. The State is at the expense of carrying
on this prosecution. That is the smallest matter of consider-
ation in the whole transaction, is the expense and trouble or
inconvenience that the State may be put to, because the State
is able to stand it; more able to stand it than anybody else
connected with it. But it is not a trifling consideration,
because the State represents all the people, and their rights,
after all, are supreme. And yet, in a case like this, they are
no higher than the rights of the defendant; they are just
exactly on a level with his rights. Still, a mistrial could
not satisfy the demands of the State. The State, first of all,
wants an end of this litigation, and if it be just that the
State should have a verdict against the defendant, then the
State wants that; if it be not just, the State does not want
that. On the other hand, turn to the position of the defend-
ant. He is put to the anxiety, the annoyance, the incon-
venience, the interference with his affairs, as well as the ex-
pense, of having to go over this case and of having had to
go over it already; and if you fail to agree, then of having to
go over it again before another jury who, as I have said,
will be in no better position, if indeed, as good a position,
to decide the case as you are. Now, those are very high
considerations, both on behalf of the State and of the de-

.fendant. There ought to be an end of this case. Well, now, when you come home to yourselves with the personal consideration, as I have said, I don't suppose it is a satisfactory state of affairs amongst the jurors yourselves that you can't agree. You are men—not children. You are good and lawful men. You have that stamp put upon you by the fact that you are here as jurors. Men of good common sense, free from all legal exception, brought here and sworn upon your solemn oaths to take the facts of this case and the law of this case and ascertain for yourselves what are the facts, and determine upon a verdict. Now, where such men are put upon their duty to perform a service and fail to perform it, it cannot be satisfactory to the men themselves. So much for those aspects of the case. Well, now, as I have said, it may sometimes develop that it is impossible for a jury to agree, without somebody sacrificing not merely some unimportant view. that he has of the case, but some conscientious view that he cannot sacrifice or give up without doing violence to his oath. And no man is required to do that. On the other hand, the considerations that I have mentioned now make it imperative on you to exhaust every effort that is within your power to reach an agreement before you give it up. I don't suppose any man of you, if he was at home about his own affairs and had a difficult proposition put to him, or a difficult task, would be willing to surrender and say he was not able to do it, until he had tried every reasonable means to do it. And that is just the situation that confronts you here now. This is a task that has given you, or a duty that has given you, some trouble. You have been engaged in this matter for some considerable time, and probably you yourselves are not willing to give it up until it develops that you just simply can't agree. Well, now, taking that view of it, that the jury themselves are anxious—not eager, but anxious—as earnest, honest, faithful, true men, to do your full duty in this case, I don't think it has yet been established that you are ready to surrender and admit that you cannot reach a conclusion in the

case. I don't mean by that that a man must sacrifice his opinions, his solemn, conscientious opinions, in a case in order to arrive at a verdict. It may be a much higher and more solemn duty for a juror to disagree with his fellow-jurors than it is for him to agree. I say, it may be that a case might arise in which that would be true. But looking at the matter in a practical way, the duty of each juror is to agree with his fellow-jurors upon a verdict, and to leave no reasonable means of conference, comparing of views, untried to agree. Now, I am not willing to accept from this jury as yet the surrender, the admission on your part that you cannot agree, that this task is too difficult for you. It is not my purpose to keep you here merely for the purpose of keeping you, and trying to force you against your consciences into a verdict. I am not going to do that. I hope the jury has already caught the impression that the Court is anxious to make you comfortable, to do everything possible to contribute to your welfare and to aid you in reaching a conclusion in this case. And that is an earnest of the purpose of the Court still to aid you in arriving at a conclusion and to give you all the time necessary for you to reach a conclusion. But I hope it is also an earnest to you that the Court does not have any disposition to punish you, and is not going to keep you here merely through stubbornness or anything of that kind. I don't think you are stubborn—I have no such idea as that—and I am quite sure that no one else connected with this case has taken the stubborn position that they won't allow the case to go off otherwise than with a verdict. But until it becomes practically an impossibility to reach a verdict, I think the jury will concur with me that we ought not to give the matter up, but ought to make further efforts to agree. And I am going to give you further time, and if now or at any time subsequently you desire any further assistance from the Court of the character of assistance that the Court is able to afford you, let it be known and it will be gladly furnished you. And as your comfort has already been ministered to and provided for, so for the fur-

ther time in which you may be occupied in the consideration
of the case you may be sure that anything that can be done
to conduce to your well being and comfort will be done.
But I cannot allow you to give up the case as yet. It is too
important for the defendant and for the State to have an end
of the matter, as well as important for you as good and law-
ful men, for us to give it up as yet.'

"(a) The jury having returned a second time to the
court room and announced that they could not agree on a
verdict, it was error in sending them back without their con-
sent. (b) It was an undue urging and forcing the jury to
find a verdict. (c) The financial loss and cost to the State
was urged as a reason why a verdict should be reached, and
the jury were told that this consideration was not trifling
and that the rights of the people whom the State represented
were supreme.

"VI. The Court below erred when in charging the de-
fendant's request to charge, 'that words do not justify
blows or resorts to violence,' by modifying the same as fol-
lows: 'That brings us again to that question of a person be-
ing in fault. The law does declare that words do not
justify a blow. But, on the other hand, if words call forth
a blow—I mean, opprobrious words—words which show
that a man is not within the bounds of his duty to his fellow-
man, that he is failing in his duty to his fellow-man or in his
conduct to his fellow-man, then the question—I say, if the
words show that—why, then, as a matter of course, the man
who uses such words. opprobrious words, cannot say that he
was without fault in provoking the blow. It is a matter of
good conduct, and that expression 'without fault' is a deep
and a broad expression. It don't simply refer to the mat-
ter as to which struck the first blow, but who was at fault
in the breach of decorum, breach of good conduct, breach of
the rights of his fellow-man and breach of his duty to his
fellow-man, growing out of the rights of his fellow-man. So
that if a man uses opprobrious language and if that is a
breach of his duty to observe good conduct to his fellow-

man, to do no harm to him, not only to his person, but to his feelings, his name, his reputation, his character; I say, if a man acts in such a way as to do violence to those matters—matters which sometimes are just as dear, probably dearer, to a person than his mere physical being—then he fails in his duty. And that is what 'fault' means; 'fault'—a failure; 'without fault'—without any failure; without any default or defalcation in good conduct. Irrespective of lawsuits and things of that kind, it is the duty of every person in society to so conduct himself as to do no harm in any way to his fellow-man. And if he transcends that duty, either by transgressing or by omitting his duty, that is a failure. And a failure is a fault; a fault is a failure. The two words come from the same derivation and mean one and the same thing, practically. So while words do not justify a blow, a man cannot use words and say he is without fault, that there was no failure on his part to observe his duty to his fellow-man, when he uses opprobrious language. That is altogether in the abstract, but you will take that and apply it to the facts in this case and determine for yourselves whether the defendant in invoking the right of self-defense was without fault.'

"(a) The request as modified does not correctly state the law of self-defense as to its constituent element of 'being without fault in bringing on the difficulty.' (b) The ideal standard of conduct and morals laid down in this charge as being necessary to enable a defendant to claim self-defense, is foreign to the criminal law. (c) The charge laid down the rule that if in using words a party fails in his duty, any breach of decorum, any breach of good conduct, or any breach of the rights of his fellow-man, that any act or words that reflect on or does violence to the feelings, reputation or character of another, will exclude the right of self-defense. The Court should have held: (d) that a person is not deprived of the right of self-defense because he uses insulting language. (e) That one who insults another by opprobrious words may be bound to anticipate that the in-

sulted person will repel the insult to the extent the law allows, but he is not bound to anticipate that he will go to the extent of attempting to take his life.

"VII. The Court below, in defining as an element of self-defense that there must be no other probable means of escape, erred in charging the jury as follows: 'For instance, a man is not allowed to kill another man if by running away he can get out of danger.'

"(a) The charge does not correctly state the law of self-defense. (b) The law does not require a person to 'run away' when attacked, on the penalty of losing the right of self-defense.

"VIII. The Court below erred in carrying on a private conversation with the jurors about the case, and discussing the case with members of the jury not in the hearing of defendant or his counsel.

"(a) It violated article I., section 18, of the Constitution of this State, requiring criminal prosecutions to be public. (b) The defendant was entitled to be cognizant of every stage, step and progress of his trial. (c) The defendant is not required to hear at 'second hand' any part or proceeding of his trial. On two occasions during the trial of this case and while the Court was instructing the jury, one of the jurors left his place in the jury box, went up to the Judge's bench and he and the presiding Judge had a private conversation about the case.

"IX. The Court below erred in refusing a new trial to the defendant on the ground which was based on the affidavit of the juror, Eli Hatchell, to the effect that during the trial of the case and while he was at the Central Hotel at night, in the charge of Constable Matthews, a bailiff of the Court, talked about the case in his presence and said that the defendant should be punished, and in holding that there was nothing before him to show that the verdict was influenced by it.

"(a) It was an effort of an officer of the Court, in charge of the jury, and whose duty it was to protect it from outside

influences, to influence the jury against the defendant. (b) It deprived the defendant of a public trial by an impartial jury. (c) It deprived the defendant of the right to be confronted by the witnesses against him. (d) It is against the public policy of the State to permit such secret influences against an accused to be used by one of its officers to whom the custody of the jury is delivered. (e) It was not incumbent on defendant to prove affirmatively that the verdict was influenced by it. (f) The verdict might have been influenced by it.

"X. The Court below erred in refusing the defendant's motion for a new trial on the 5th ground submitted, to wit: 'That the jury having returned to the court room twice and announced that they could not agree, the Court sent them back the third time, without their consent or request.'

"XI. The Court below erred in overruling the defendant's motion for a new trial on the 4th ground submitted, to wit: '4. Error in charging modification of request to charge that words do not justify blows—to the effect that if words produce blows, that if in using words the party fails in his duty, then he cannot claim that he was without fault in bringing on the difficulty.'

"XII. The Court erred in charging the jury to the effect that where one party was in fault in bringing about an encounter, that for the party in fault to be allowed to plead self-defense the encounter would have to be finally ended, and not a continuation of the first, which had been merely interrupted. That each meeting would have to be independent. The Court should have held that where the first encounter had been interrupted and renewed by the other party not in fault in bringing about the first encounter, the party in fault in the first may plead self-defense, if without fault in renewing the encounter."

*Messrs. Galletley & Ragsdale* and *Walter H. Wells,* for appellant.

*Solicitor Jno. S. Wilson* and *Mr. W. F. Clayton,* contra.

No arguments furnished Reporter by either side.

An opinion was first handed down in this case on February 28, 1906, but on petition for rehearing, on May 26, 1906, a reargument was ordered at the April Term, 1906.

December 10, 1906. The opinion of the Court was delivered by

Mr. Chief Justice Pope. William P. Rowell was tried at the March, 1905, term of the Court of General Sessions of Florence County, before Judge Klugh and a jury, on an indictment for the murder of Joseph C. Blount, and for unlawfully carrying about his person a pistol of unlawful length and weight. He was convicted of manslaughter with a recommendation to mercy, but found not guilty of the charge of carrying a concealed weapon. He was sentenced to five years imprisonment in the penitentiary. Upon due notice, an appeal was taken from the rulings of the Court, the verdict and the sentence.

The history of the alleged crime is about as follows: The defendant was drinking and was more or less under the influence of intoxicating liquor on the afternoon and evening of the 16th of December, 1904. About half an hour before the alleged homicide, two gentlemen passed along on the sidewalk where the defendant was leaning against a post. He interrupted the conversation between Mr. Speed and Mr. O'Bryan, by remarking after one of their remarks to each other, "It is a damn lie and I don't believe a word of it; and you are going to the blind tiger to get a drink." Mr. Speed struck a match to see the face of the man speaking. This occurred about forty yards distant from the place of the homicide. This testimony was objected to, but was admitted. Mr. W. T. Rouse testified that about four o'clock, Rowell came to his store and had been drinking. What else occurred in the conversation was ruled out by the Circuit Judge as immaterial. About eight o'clock, Rowell

came upon the scene of the homicide and asked if any one had seen the deceased, Blount. Upon being told by a bystander that Mr. Blount was there, Rowell sought out Blount and charged him with having drunk that evening liquor from a blind tiger. This was denied by Mr. Blount, who was then informed by Mr. Rowell that "he need not lie about it." Mr. Blount walked off to have a conversation with another gentleman, a Mr. Jeffords, and after finishing the conversation, stepped back to where Mr. Rowell was standing. The conversation as to the alleged drink at the blind tiger by Mr. Blount was resumed, and the lie was passed by both parties. Mr. Blount seized a stick from the hands of Mr. Rowell. Mr. Rowell drew his pistol; the blow from the stick in Mr. Blount's hands across the head of Rowell and the firing of the pistol by Rowell upon Blount was simultaneous. Mr. Blount fell dead, Mr. Rowell was bleeding, and was instantly arrested by the policeman of the city of Florence.

The exceptions will be reported. We will now pass upon them in their order.

1. We think the Circuit Judge committed no error. It is always well to let the jury understand what was the condition of the accused as shown by his conduct and language preceding the deadly encounter. If the defendant was drunk, quarrelsome, insulting, these facts are relevant. It is always to be desired that the jury should understand how the accused was deporting himself immediately preceding the homicide. In this case, the Circuit Judge was very careful to exclude any testimony which was not nearly immediately conected with the homicide, and that which was admitted by him only preceded the homicide by half hour. The Circuit Judge, if anything, was too careful in denying to the jury the benefit of the testimony offered, which preceded the difficulty by four hours. We must, therefore, overrule this exception.

2. When the witness for the defense, Leon D. Morris, was upon the stand, he was asked whether he knew if it was

the habit of Mr. Blount to go armed, the witness replied, "Yes, sir." After this answer the solicitor objected, and the Court held that the testimony was incompetent. No effort was made to strike out the testimony already given before objection was made, and hence we see no error was committed by the Judge. Especially as Mr. Rowell, when examined on his own motion, stated that he could not say that he had ever seen Mr. Blount with a pistol, but supposes, being an officer of the railroad, he did carry a pistol. He could not say of his own knowledge that Mr. Blount did have a pistol. This exception is overruled.

3. We do not see that the Circuit Judge erred in allowing the solicitor to cross-examine John L. Rogers as to what statements he made in writing subscribed by him pertaining to the homicide The paper was not introduced in evidence by either side, the State or the defence, but the solicitor on said cross-examination examined the witness, asking him if he had not made such statements, some of which he admitted and some he denied. The defendant thought he should be allowed to see this paper. This exception is overruled.

4. This exception relates to the cross-examination by the State of Mr. W. B. Rowell, after he had testified in his own behalf. Of course, there are certain exceptions to the free cross-examination of the defense, such as the witness not being bound to incriminate himself, but with these exceptions a defendant, who offers himself as his own wtiness, is subject to a full cross-examination by the State. It must be remembered that the defendant who offers himself as a witness must be expected to answer all questions propounded by the State in such cross-examination. His credibility is thus tested, and besides, in the interest of justice, he may be expected to have his memory fully tested. This exception is overruled.

5. This exception relates to the alleged error of the Circuit Judge in causing the jury to return to the jury room after they had been out twice, with a statement that they

could not agree, in violation of section 2449 of the Civil Statute Law of the State, volume 1, which is as follows: "When a jury, after due and thorough deliberation upon any cause, return into Court without having agreed upon a verdict, the Court may state anew the evidence, or any part of it, and explain to them anew the law applicable to the case, and may send them out for further deliberation; but if they return a second time without having agreed upon a verdict, they shall not be sent out again without their own consent, unless they shall ask from the Court some further explanation of the law." The Court, in the case of the *State* v. *Kelly,* 45 S. C., 666, 24 S. E., 45, has considered this statute and the duty of the Judge and jury under the same. In the case cited, the jury had returned to the court room on two occasions, notifying the Court of their inability to agree and requesting the Court, through the foreman, as follows: "We have been in the room twenty-four hours and can't agree," and these words were uttered after the jury had been ordered to their room a third time.

A very different state of affairs is presented in the case at bar, for here there was no indication of any unwillingness on the part of the jury to retire a third time. Indeed, members of the jury requested of the presiding Judge that he would state anew the law on self-defense, and the presiding Judge did charge the jury as requested. This Court admits that this is a very delicate duty imposed upon the Circuit Judge, but we hold that there must be some indication of unwillingness on the part of the jury to again retire to agree upon the verdict, and they must not ask for a charge by the Judge upon any matters committed to the jury, if the jury insist upon their right to be discharged. Of course, there must be no coercion practiced upon the jury to force them to a verdict, and the language of the Circuit Judge shows in this instance how anxious he was that such coercion should not take place. This excetpion is overruled.

6. The sixth exception alleges the Circuit Judge erred in charging that the defendant would not be without fault in bringing on the difficulty, and, therefore, could not avail himself of the plea of self-defense, if he used any opprobious words or was guilty of any breach of decorum which resulted in an attack upon him. This was error. The true rule is that the plea of self-defense is not available to one who uses language so opprobrious that a reasonable man would expect it to bring on a physical encounter, and which did actually contribute to bringing it on. The defendant's testimony as to the language used by him, and his manner in using it, made an issue of fact as to whether he had just reason to suppose his language to the deceased would probably result in a personal difficulty. This exception must, therefore, be sustained.

7. The error here complained of does not seem to us real. It was intended to emphasize the duty of a man to avoid the taking of human life, where it is possible to prevent it, even to the extent of fleeing from one's adversary. When a Judge realizes what is meant by taking human life, he ought to prevent such direful result by all the words he can use. We might say, in carefully looking over the testimony in this case and also reading the charge in this case, that this is an abstract rule of duty and was not strictly involved by the conduct of these parties, the deceased and the defendant. This exception is overruled.

8. This exception relates to the Circuit Judge allowing jurors to approach him while the jury was in the court room and to speak to him in a whisper while on the bench, in the presence of the jurors and of the attorneys on each side, which the Circuit Judge at once announced publicly. There is no doubt that the greatest care in a Circuit Judge is required so that no possible doubt could exist as to what passes between him and a juror. It is far better that the juror should be required by the Judge to declare openly what information he would seek from him, and thus avoid any possible misconstruction. But the Judge in

this case endeavored at once to impart the utmost publicity to what the juror said to him privately, by himself stating what had been asked. There was no hesitation and no delay by Judge Klugh in making known what the juror had asked him, for he gave his reply openly in the presence of all concerned. Under these circumstances, we feel that there had been no interference with the cause of justice in this matter. This exception is overruled.

9. This exception relates to the refusal of the Circuit Judge to grant a new trial on the affidavit of the juror, Eli Hatchell, to the effect that during the trial of the case, and while he was at the Central Hotel that night in charge of Constable Matthews, a bailiff of the Court talked about the case in his presence, and said that the defendant should be punished; and in holding that there was nothing before him to show that the verdict was influenced by it. It may be the Court should have punished this bailiff for his conduct, and that Eli Hatchell, the juror, should have informed the Court of the bailiff's conduct, but we do not think there was any such interference with the jury as to require a new trial. Objections to verdicts on the ground that one or more of the jurors has been subjected to outside influences must be looked at in a practical way and every case decided on its own facts. Those cases are strongest in which the juror has lent himself to such influence as signified a willingness to receive advice or favors. Those, however, who are selected to serve as jurors must be considered to have personal firmness and conviction, and not be presumed to bend to every wind of opinion that blows around their ears. Where, without any misconduct on the part of the juror or the constable who had him in charge, an opinion was imprudently volunteered in the presence of the juror by another constable, we do not think it would be reasonable to reach the decision that the conclusion of this juror and the whole panel was influenced by it.

The tenth, eleventh and twelfth exceptions have been disposed of in what has already been said.

The sixth exception is sustained, and all of the others are overruled.

It is the judgment of this Court, that the judgment of the Circuit Court be reversed and the cause remanded for a new trial.