502 S.E.2d 99

**The STATE, Respondent,**

v.

**Theodore KELLY, Appellant.**

**No. 24809.**

Supreme Court of South Carolina.

Heard May 6, 1997.

Decided June 29, 1998.

Rehearing Denied July 30, 1998.

Assistant Appellate Defender Robert M. Pachak, of S.C. Office of Appellate Defense, Columbia, for appellant.

Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Columbia; and Solicitor Holman C. Gossett, Jr., Spartanburg, for respondent.

BURNETT, Justice:

Appellant Theodore Kelly was convicted of murdering his estranged wife, Imogene Kelly (Mrs. Kelly), and her daughter's fiancé, Keith Epps. Appellant was also convicted of assault and battery with intent to kill for his attack on Mrs. Kelly's daughter, Tracy Smith. Appellant was sentenced to death for the murders[1] and twenty years for assault and battery with intent to kill.

## FACTS

This incident arose out of a domestic dispute between appellant and Mrs. Kelly. Mrs. Kelly's daughter, Tracy, testified her mother had obtained a restraining order against appellant in March of 1994. She further stated Mrs. Kelly contacted the police on June 7, 1994, at approximately 5:30 p.m. because appellant had come to her residence. However, when the police arrived, they refused to enforce the order because they determined appellant had been living in the residence after the March restraining order was issued. Therefore, the police informed Mrs. Kelly her restraining order was invalid and she would have to obtain a new order. The police did escort appellant off the premises. After another discussion later that same evening between the police, Mrs. Kelly and appellant, Mrs. Kelly agreed to place appellant's clothes in a plastic garbage bag and leave it for him on the front porch.

Tracy testified she saw appellant outside the house around 10:00 p.m. that night; however, she did not call the police

---

1. The jury found the following statutory aggravating circumstance: two or more persons were murdered by the defendant by one act or pursuant to one scheme. S.C.Code Ann. § 16–3–20(C)(a)(9) (Supp. 1997).

because she thought he was there to get his clothes. Mrs. Kelly, Tracy's five-year-old son, and Mrs. Kelly's three-year-old adopted daughter went to bed around 10:00 p.m. They all slept in the same bed. Tracy and Keith were in Tracy's bedroom. Around 11:00 p.m., Keith went out to his car. Immediately after Keith left the house, Tracy heard a gunshot and then appellant ran into Tracy's bedroom. She attempted to hide in her closet; however, appellant attacked her and shot her twice. Appellant then ran out of Tracy's room and into her mother's room. Tracy heard her mother say "no Theodore" and she heard two gunshots. During this time Tracy attempted to leave the room; however, appellant returned to her room and she, again, ran to the closet. As appellant attempted to pull Tracy out of the closet, he shot at her again but missed. Appellant then returned to Mrs. Kelly's room and Tracy heard the sound of a physical assault. Tracy again attempted to leave the room; however, appellant returned and began striking her on the head with the gun. Appellant then went into the kitchen, returned with a knife, and stabbed Tracy several times. Appellant went toward the front of the house and Tracy was able to escape and run to a neighbor's house for help.

Tracy's son, who was in the bedroom with Mrs. Kelly, testified the sound of a gunshot woke him and he saw appellant shoot and beat Mrs. Kelly. Tracy's son testified appellant told him to go back to sleep and he did.

Keith's body was found outside the home with a .25 caliber gunshot wound to the head. Mrs. Kelly's body, severely beaten and with two .25 caliber gunshot wounds, was found in her bedroom. Tracy suffered two gunshot and several stab wounds. Fortunately, she survived the attack. Remarkably, the two children, who were sleeping in Mrs. Kelly's bedroom, were unharmed. The gun was never found. The clothes Mrs. Kelly had left on the porch for appellant were gone.

Appellant testified after his dispute with Mrs. Kelly he went to play softball. Because he was upset, he decided not to play and rode with some men to a liquor store where he purchased and consumed a pint of liquor. Appellant then testified he went with the men to a crack house near Mrs. Kelly's residence, where he ingested some cocaine. Appellant purchased

a .25 caliber automatic pistol from patrons of the crack house and walked to Mrs. Kelly's residence to pick up his clothes. When he arrived, Keith opened the front door and began threatening appellant. Keith and appellant fought. During the fight, Tracy and Mrs. Kelly came to the door and Mrs. Kelly threw Keith a gun and told Keith to shoot appellant. When Keith reached for the gun, appellant shot him with the .25 caliber pistol. Appellant testified he did not remember anything after that point until he was back at the crack house. A pistol clip from a .380 caliber pistol or a nine millimeter pistol was found outside Mrs. Kelly's residence. This clip could not be used in a .25 caliber pistol.

## ISSUES

I. Did the trial judge abuse his discretion in refusing to grant appellant's motion for a mistrial based on juror misconduct?

II. Did the trial judge err in denying appellant's motion for a new trial based on information obtained about one of the jurors after the conclusion of the trial?

III. Did the trial judge err in finding appellant competent to stand trial prior to the presentation of the defense case in the penalty phase of the trial?

## DISCUSSION

### I.

■ Appellant argues the trial judge erred in refusing to grant his motion for a mistrial based on juror misconduct. We disagree.

After all the testimony had been presented, but prior to closing arguments in the penalty phase of the trial, the trial judge received a note from Juror S.[2] The note indicated a religious pamphlet concerning God's view on capital punishment was being circulated in the jury room. Upon receiving the note, the trial judge questioned the jurors individually to determine who, if anyone, had read the pamphlet and what information was contained in the pamphlet.

---

2. The names of the jurors are not relevant to this discussion.

First, the trial judge questioned Juror S, who claimed she had only seen the outside cover of the pamphlet. According to Juror S, Juror O had brought the pamphlet into the jury room and Juror O had shared the pamphlet with Juror H and Juror A. Juror S also stated other members of the jury were reading their Bibles on an individual basis. The trial judge *voir dired* the jurors named by Juror S as to whether they had received or been exposed to a pamphlet. None of the jurors admitted to being exposed to any material outside of the courtroom. All the jurors confirmed they could render a fair and impartial verdict based solely on the evidence presented in the courtroom.

Because the trial judge was concerned the jurors did not understand his questions, he inquired again and specifically asked the jurors if they had read a pamphlet expressing God's view on capital punishment. Four jurors admitted to either seeing and/or reading the pamphlet. However, three of these jurors claimed they could not recall any of the contents of the pamphlet or whether it expressed a view on capital punishment. Further, these jurors stated the pamphlet had not been offered to them until that morning. These three jurors indicated their exposure to this pamphlet would not interfere with their ability to render a fair and impartial verdict. The fourth juror, Juror O, admitted the pamphlet belonged to her and that her prayer partner at church had given her this pamphlet prior to sequestration. Juror O showed the pamphlet to the trial judge and stated the pamphlet contained Biblical references on capital punishment.[3] Juror O further admitted she offered this pamphlet to other jurors; however, she was unsure if any of the other jurors had actually read the pamphlet. Two other members of the jury indicated they were reading their Bibles on their own.

Appellant's counsel made a motion for a mistrial based on this pamphlet arguing the jurors had been less than truthful when initially questioned under oath, at least four jurors had been tainted by the pamphlet and, because Juror O possessed

---

3. The pamphlet, "God, Law, and Capital Punishment," expresses a pro-death penalty view and references Bible passages to support its view.

this pamphlet prior to the commencement of the trial, both phases of the trial were affected.[4]

The trial judge denied appellant's mistrial motion; however, he did dismiss Juror O. The trial judge specifically found the pamphlet did not influence the verdict rendered in the guilt phase because the pamphlet concerned capital punishment. The trial judge further concluded no other juror had been exposed to the contents of this pamphlet and the remaining jurors indicated they could render a fair and impartial verdict based on his instructions. Therefore, the trial judge found the remaining jury members were not biased by the pamphlet.

The Sixth and Fourteenth Amendments of the United States Constitution guarantee a defendant a fair trial by a panel of impartial and indifferent jurors. *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *see also* S.C. Const. art I, §§ 3 & 14. To safeguard these rights, "it is required that the jury render its verdict free from outside influences of whatever kind and nature." *State v. Cameron,* 311 S.C. 204, 207, 428 S.E.2d 10, 12 (Ct.App.1993).

In a criminal prosecution, the conduct of the jurors should be free from all extraneous or improper influences. Unless the misconduct affects the jury's impartiality, it is not such misconduct as will affect the verdict. The trial court has broad discretion in assessing allegations of juror misconduct. Relevant factors to be considered in determining whether

---

4. Appellant did not argue to the trial judge that the jurors were engaging in premature deliberations. Therefore, this issue is not preserved for appellate review. *State v. Byram,* 326 S.C. 107, 485 S.E.2d 360 (1997) (an issue must be raised to and ruled upon by the trial judge in order to be preserved for appellate review). Further, in his brief, appellant relies on the Bible reading by certain jurors as a ground for a mistrial. Although this issue was raised in the new trial motion, it was not raised as a ground for a mistrial. Thus, appellant cannot properly raise this type of trial error for the first time in his new trial motion. *State v. Holmes,* 320 S.C. 259, 464 S.E.2d 334 (1995), *cert. denied,* 517 U.S. 1248, 116 S.Ct. 2507, 135 L.Ed.2d 197 (1996) (evidentiary error cannot be raised for first time in a new trial motion). Further, possession by jurors of personal Bibles consulted for personal guidance in the jury room prior to deliberations is not *per se* jury misconduct. *See Jones v. Kemp,* 706 F.Supp. 1534 (N.D.Ga.1989) (misconduct occurs when the Bible was allowed in the jury room for use by a deliberating jury).

outside influences have affected the jury are the number of jurors exposed, the weight of the evidence properly before the jury, and the likelihood that curative measures were effective in reducing the prejudice. Generally, the determination of whether extraneous material received by a juror during the course of the trial is prejudicial is a matter for determination by the trial court. 23A C.J.S. *Criminal Law* § 1365 (1989).

The granting or refusing of a motion for a mistrial lies within the sound discretion of the trial court and its ruling will not be disturbed on appeal unless an abuse of discretion amounting to an error of law occurs. *State v. Wasson,* 299 S.C. 508, 386 S.E.2d 255 (1989). A mistrial should not be granted unless absolutely necessary. Instead, the trial judge should exhaust other methods to cure possible prejudice before aborting a trial. *Id.* In order to receive a mistrial, the defendant must show error and resulting prejudice. *Id.* The trial judge is in the best position to determine the credibility of the jurors; therefore, this Court should grant him broad deference on this issue. *State v. Johnson,* 248 S.C. 153, 149 S.E.2d 348 (1966) (the question of the impartiality of the juror is addressed to the discretion of the trial judge); *State v. Loftis,* 232 S.C. 35, 100 S.E.2d 671 (1957) (refusing to interfere with the discretion of a trial judge in matters involving the jury because the trial judge has the opportunity to consider the credibility of the jurors).

While it was improper for Juror O to possess this pamphlet, in our opinion, appellant failed to show prejudice. Initially, we find it illogical to assume Juror O was influenced in the guilt phase of the trial because of this pamphlet. At most, this pamphlet may influence a juror to sentence a convicted defendant to death for his crime. Therefore, the trial judge correctly concluded this pamphlet did not affect the verdict rendered by the jury in the guilt phase of this trial.

Moreover, the trial judge is in the best position to determine the credibility of the jurors and he found them credible and capable of rendering an impartial verdict based solely on the evidence. *See State v. Johnson, supra.* The trial judge conducted extensive *voir dire* of the jurors both prior to empaneling the jury and during questioning concerning this incident. The trial judge questioned jurors extensively about

potential biases and prejudices and, thus, placed himself in the best position to assess the truthfulness of the jurors. Further, the trial judge consistently admonished the jury not to discuss the case and not to consider extraneous material. The trial judge did not find members of the jury were being untruthful. We respect this finding.

Further, the misconduct occurred prior to deliberations and the trial judge immediately removed the tainted juror. *See United States v. Hill,* 688 F.2d 18 (6th Cir.), *cert. denied,* 459 U.S. 1074, 103 S.Ct. 498, 74 L.Ed.2d 638 (1982) (both jurors exposed to extraneous materials were dismissed from the jury prior to deliberations and the materials were immediately removed from the jury room; therefore, defendant suffered no prejudice); *State v. Rodgers,* 7 Ariz.App. 29, 435 P.2d 864 (1967), *vacated on other grounds,* 103 Ariz. 393, 442 P.2d 840 (1968) (affirming trial court where although the juror committed misconduct by reading a book on criminal instructions during a recess, the trial court carefully went into the effect of the extracurricular reading and concluded there was no prejudice); *Jordan v. State,* 207 Ga.App. 710, 429 S.E.2d 97 (1993) (affirming trial court where trial court questioned juror who had brought material into the jury room and found no harm); *Earley v. State,* 595 So.2d 430 (Miss.1992) (finding no abuse of discretion where the only juror who read the entire newspaper article was promptly dismissed and the other jurors who had only read portions of the article which were not prejudicial were retained); *Lane v. State,* 110 Nev. 1156, 881 P.2d 1358 (1994), *cert. dismissed,* 514 U.S. 1058, 115 S.Ct. 1444, 131 L.Ed.2d 323 (1995) (no abuse of discretion in denying defendant's motion for a mistrial where the juror who brought the book into the jury room was removed and all other jurors indicated upon questioning that they had not been influenced by the dismissed juror and would follow the law as instructed); *State v. Bonney,* 329 N.C. 61, 405 S.E.2d 145 (1991) (upholding the trial court's denial of defendant's mistrial motion where trial court conducted a thorough inquiry and court removed juror who had brought a book entitled "The Complete Jack the Ripper" into the jury room during the trial and had watched the news coverage of this trial on television); *State v. Searles,* 159 Vt. 525, 621 A.2d 1281 (1993) (trial court has discretion in evaluating the impact of a news account upon the

jury and, where some jurors had knowledge of the news account but no juror responded that the knowledge would influence the juror's judgment, there was no showing of an abuse of discretion).

There is no evidence suggesting any juror except Juror O had access to the pamphlet prior to the morning of closing arguments in the sentencing phase of the trial. Therefore, the deliberations of the remaining jurors were not tainted by the pamphlet and, in our opinion, the trial judge did not abuse his discretion in denying appellant's motion for a mistrial. Instead, the trial judge took appropriate action by removing the tainted juror from the jury and replacing her with an alternate juror to ensure appellant received a fair and impartial verdict.

## II.

■■ Appellant contends the trial court erred in denying his new trial motion based on information obtained about Juror P after the trial concluded. Specifically, appellant claims Juror P's failure to disclose his participation in a death penalty rally in 1986 during *voir dire* prevented appellant from making an intelligent decision in exercising his peremptory strikes. We disagree.

Juror P was never specifically asked during *voir dire* about his participation in a death penalty rally. The defense did question Juror P about his "position" on the death penalty. Juror P's response to this question was it would depend on the situation. Juror P admitted he had thought about the death penalty in the past. During *voir dire*, Juror P indicated he could be fair and impartial and depending on the circumstances he could return either a life sentence or death sentence. Juror P indicated once again he could be impartial when questioned about the pamphlet incident.

After the jury returned its sentence in this case, a local newspaper article quoted Juror P as saying "I think the only thing I regret is that [appellant] has only one life to give for the two he took." In the article, Juror P revealed in 1986 while a student at Winthrop College, he led a group of 40 students on a trip to Columbia to attend the execution of Terry Roach. An article in the Winthrop paper indicated Juror P was supporting the execution of Roach; however, he

was not advocating execution in all cases. Further, the rally was organized as an educational program in an effort to raise social awareness.

Appellant's new trial motion was premised on Juror P's misleading and incomplete answers on *voir dire*. Appellant maintained that had he been aware of Juror P's activities, he would have exercised a preemptory strike to exclude Juror P from the jury. After careful review of Juror P's *voir dire* and the newspaper articles, the trial judge denied the new trial motion finding nothing Juror P did in 1986 had any bearing on his *voir dire* in this case. The trial judge found Juror P qualified as a potential juror and his activities in 1986 did not disqualify him. He refused to allow appellant to question Juror P.

Appellant does not claim Juror P was disqualified as a potential juror as a matter of law. Instead, the question is whether Juror P intentionally concealed information during *voir dire,* thus denying appellant the opportunity to make an informed decision concerning the seating of this prospective juror.

■ A trial court's denial of a new trial motion will not be disturbed on review absent a showing of an abuse of discretion which results in prejudice to the defendant. *State v. Dawkins,* 297 S.C. 386, 377 S.E.2d 298 (1989); *State v. Savage,* 306 S.C. 5, 409 S.E.2d 809 (Ct.App.1991).

■ The United States and South Carolina Constitutions guarantee a criminal defendant the right to an impartial jury. U.S. Const. amend. VI; S.C. Const., art. I, § 14. To protect both parties' right to an impartial jury, the trial judge must ask potential jurors, *inter alia,* whether they have formed an opinion about a case or are aware of any bias or prejudice against a party. *State v. Cason,* 317 S.C. 430, 454 S.E.2d 888 (1995); S.C.Code Ann. § 14–7–1020 (Supp.1997). This Court has recognized trial judges and attorneys cannot fulfill their duty to screen out biased jurors without accurate information.

Necessarily it is expected and required that jurors in their answers shall be completely truthful and that they shall disclose, upon a general question, any matters which might

tend to disqualify them from sitting on the case for any reason. It therefore becomes imperative that the answers be truthful and complete. False or misleading answers may result in the seating of a juror who might have been discharged by the Court, challenged for cause by counsel or stricken through the exercise of peremptory challenge.

*State v. Gulledge*, 277 S.C. 368, 371, 287 S.E.2d 488, 490 (1982) (quoting *Photostat Corp. v. Ball*, 338 F.2d 783 (10th Cir.1964)); *see also* 47 Am.Jur.2d *Jury* §§ 195, 208–09 (1995).

 "[A new trial] is required only when the court finds the [intentionally] concealed information would have supported a challenge for cause or would have been a material factor in the use of the party's peremptory challenges. The inquiry must focus on the character of the concealed information, not on the mere fact that a concealment occurred." *Thompson v. O'Rourke*, 288 S.C. 13, 15, 339 S.E.2d 505, 506 (1986). Using the juror disqualification analysis developed by this Court, our first question is whether Juror P intentionally concealed information in not revealing his past activities during voir dire. *Gray v. Bryant*, 298 S.C. 285, 379 S.E.2d 894 (1989).

Here, we find no abuse of discretion because Juror P did not intentionally conceal information during voir dire. *Gray v. Bryant, supra* (finding intentional concealment where juror failed to disclose relationship when asked specifically about existence of relationship); *State v. Savage, supra* (finding failure to disclose relationship was not intentional). Appellant failed to show Juror P's responses during voir dire were untruthful or deceitful. When questioned about his "position" on the death penalty, Juror P admitted he had "thought about it in the past." However, he indicated his "position" would depend on the circumstances of each case. Juror P was not specifically asked if he had participated in death penalty activities in the past. In our opinion, a question concerning Juror P's "position" on the death penalty would not elicit the information appellant claims was intentionally concealed. Further, Juror P's activities in 1986 only indicate he supported the execution of Roach, not that he supported execution in all cases. This is consistent with his testimony given during voir dire indicating that, depending on the circumstances, he could impose a life sentence or a death sentence.

### III.

■ Appellant contends the trial judge should have granted a continuance in the penalty phase of the trial when Dr. Lillian Tidler, a court qualified forensic psychiatrist, concluded appellant could not competently make a rational decision to take the stand and testify.

Appellant was diagnosed as suffering from Bipolar Type–II Disorder (depression with hypermanic features); a history of alcohol abuse; borderline intellectual functioning; and a partial complex seizure disorder. He also has paranoid tendencies and periodically experiences hallucinations. During the competency hearing on August 7, 1995, Dr. Tidler testified appellant was competent to stand trial; however, she informed the trial court that the stress of this trial could cause appellant to hallucinate resulting in impairment of his rational understanding of these proceedings. While the trial judge found appellant competent to stand trial, he ordered Dr. Tidler to be available to perform competency exams during the trial in case appellant's condition deteriorated.

Prior to presentation of the defense case in the penalty phase, Dr. Tidler testified that upon her most recent examination, she found appellant competent even though he was experiencing some auditory hallucinations. Dr. Tidler opined:

It is my opinion with a reasonable degree of medical certainty, that overall [appellant] possesses a rational and factual understanding of the courtroom trial process and overall possesses the ability to assist [lead counsel] and his other attorney in his defense; however, in terms of taking the stand and making a rational decision, in that area I find he is not, but overall I find he meets the statutory requirements overall.... He's competent in assisting [trial counsel], however, he disregards their legal advice based on his irrational thinking.

Dr. Tidler testified, guided in part by auditory hallucinations from his dead sister, appellant hoped that by asking the jury for death he would receive a life sentence. Dr. Tidler stated the decision to testify and ask for the death penalty was not a rational decision or consistent with appellant's wish to live. On cross-examination, Dr. Tidler testified appellant possessed a rational and factual understanding of the courtroom pro-

ceedings. Further, upon inquiry by the trial judge, Dr. Tidler stated appellant understood the roles of the judge, solicitor, defense counsel and jury.

The trial judge then questioned appellant. Appellant indicated he no longer wished to testify; however, he did want to address the jury during closing arguments. The trial judge then found appellant was still competent to stand trial. Appellant's counsel did not object to this ruling, nor did they seek other relief. During closing arguments, appellant did address the jury and ask for death in a fairly incoherent statement; however, he did not testify.[5]

On appeal, appellant contends the trial judge should have continued the penalty phase until appellant was competent to consult rationally with his attorneys regarding whether to make a statement to the jury. This claim is unpreserved for review having neither been raised to nor ruled upon below. *State v. Patterson*, 324 S.C. 5, 482 S.E.2d 760, *cert. denied*, —— U.S. ——, 118 S.Ct. 146, 139 L.Ed.2d 92 (1997).

 The test for competency to stand trial or continue trial is whether the defendant has the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational, as well as a factual, understanding of the proceedings against him. *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *State v. Nance*, 320 S.C. 501, 466 S.E.2d 349, *cert. denied*, 518 U.S. 1026, 116 S.Ct. 2566, 135 L.Ed.2d 1083 (1996); *State v. Bell*, 293 S.C. 391, 360 S.E.2d 706 (1987), *cert. denied*, 484 U.S. 1020, 108 S.Ct. 734, 98 L.Ed.2d 682 (1988). The purpose of requiring a defendant to be competent is "to ensure that he has the capacity to understand the proceedings and to assist counsel." *Godinez v. Moran*, 509 U.S. 389, 402, 113 S.Ct. 2680, 2688, 125 L.Ed.2d 321, 329 (1993); *see also*

---

**5.** Defense counsel informed the trial court prior to closing arguments in the penalty phase that they had advised appellant not to address the jury. However, the mere fact that appellant chose to disregard his lawyer's advice does not make him incompetent to stand trial. *See State v. Bell*, 293 S.C. 391, 360 S.E.2d 706 (1987), *cert. denied*, 484 U.S. 1020, 108 S.Ct. 734, 98 L.Ed.2d 682 (1988); *Adams v. Aiken*, 965 F.2d 1306 (4th Cir.1992), *judgment vacated on other grounds by*, 511 U.S. 1001, 114 S.Ct. 1365, 128 L.Ed.2d 42 (1994).

*Bell v. Evatt,* 72 F.3d 421 (4th Cir.1995), *cert. denied,* 518 U.S. 1009, 116 S.Ct. 2533, 135 L.Ed.2d 1056 (1996) (finding the trial judge only had to ensure the defendant had the capacity to understand, the capacity to assist, and the capacity to communicate with his counsel, not that the defendant was acting in accordance with his capacity). A defendant must be competent throughout the trial, not just at its commencement. *Drope v. Missouri, supra.* The defendant bears the burden of proving his incompetence by a preponderance of the evidence. *State v. Nance, supra.* The trial court's determination of competency will be upheld if it has evidentiary support and is not against the preponderance of the evidence. *Id.*

We uphold the trial court's determination that appellant was competent. In reaching his conclusion, the trial judge considered Dr. Tidler's testimony, his own observations and appellant's testimony. *See* 22A C.J.S. *Criminal Law* § 554 (1989) (trial judge is sole judge of the credibility of witnesses and the weight to be given their testimony, and he also is entitled to evaluate the conflicting testimony). Dr. Tidler found appellant possessed a rational and factual understanding of the proceedings. Further, contrary to Dr. Tidler's assertion that appellant was irrationally disregarding his counsels' advice not to testify, appellant indicated he was following his counsels' advice and did not want to testify. Thus, appellant was capable of consulting with and assisting his defense lawyers. Because there is evidentiary support for the conclusion reached by the trial court, and a finding of competency based on the record is not against the preponderance of the evidence, we affirm on this issue.

### PROPORTIONALITY REVIEW

After reviewing the entire record, we conclude the death sentence was not the result of passion, prejudice, or any other arbitrary factor, and the jury's finding of the statutory aggravating circumstance of two or more persons were murdered by the defendant by one act or pursuant to one scheme is supported by the evidence. *See* S.C.Code Ann. § 16–3–25 (1985). Further, we hold the death penalty is neither excessive nor disproportionate to that imposed in similar cases. *See State v. Williams,* 321 S.C. 327, 468 S.E.2d 626, *cert. denied,* —— U.S. ——, 117 S.Ct. 230, 136 L.Ed.2d 161 (1996);

*State v. Wilson,* 306 S.C. 498, 413 S.E.2d 19, *cert. denied,* 506 U.S. 846, 113 S.Ct. 137, 121 L.Ed.2d 90 (1992); *State v. Atkins,* 303 S.C. 214, 399 S.E.2d 760 (1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2913, 115 L.Ed.2d 1076 (1991); *State v. Kornahrens,* 290 S.C. 281, 350 S.E.2d 180 (1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1592, 94 L.Ed.2d 781 (1987); *State v. Lucas,* 285 S.C. 37, 328 S.E.2d 63, *cert. denied,* 472 U.S. 1012, 105 S.Ct. 2714, 86 L.Ed.2d 729 (1985).

**AFFIRMED.**

MOORE and WALLER, JJ., concur.

FINNEY, C.J., dissenting in separate opinion and TOAL, J., concurring.

FINNEY, Chief Justice (Dissenting):

I respectfully dissent. I would reverse and remand. In my view, the inappropriate possession and use of the extraneous pamphlet by jury members so tainted the jury that its contents affected the ability of the jury to be fair and impartial at both the guilt and penalty phases of appellant's bifurcated trial.

After a recess at the close of the presentation of penalty phase evidence, the trial judge held a conference in chambers with counsel and the appellant. The judge advised that he had received from a juror a note which stated that a pamphlet was being passed around in the jury room concerning God's word on the death penalty. Juror S was brought into chambers and the following is a portion of her examination by the judge.

THE COURT: Can you tell me a little bit about what that pamphlet says?

THE JUROR: I haven't had it in my hands, so I don't know, but I saw the outside cover of it. It says—it's like God's word on criminal punishment; and I know they have that; and one of the girls brought her Bible this morning. She has been like quoting passages and having everybody read out of the Bible. Well, not everybody, but like two people and having them read some stuff. I mean, I'm one of the most Christian people you can ever meet, but I don't think this is the time or the place.

THE COURT: All right. Have you seen this pamphlet?

THE JUROR: I've seen the outside of it. I have not looked inside of it.

THE COURT: Do you know if any other jurors have seen it?

THE JUROR: Yes, they have.

THE COURT: Can you tell me how many?

THE JUROR: I can't think how many, but I can say probably at least four—at least.

BY THE COURT: Do you know which ones?

THE JUROR: [Juror O] has it. I saw her put it in her purse.

. . .

BY THE COURT: Is she the one that brought it?

THE JUROR: Yes, I'm almost positive she is the one that brought it. I mean, it is in her purse right now. I saw her put it in there. There's her; there's I think four of them have seen it. I'm pretty sure [Juror H] has. I'm not positive on [Juror H], but I'm pretty sure she has.

THE COURT: That's [Juror H].

THE JUROR: Yes. And also I think [Juror A] has seen it—[Juror A]. I didn't realize until, you know, the last person was looking at and they had been talking about it, but I did not know what it was until I saw the outside cover of it.

. . .

THE COURT: All right. And in so far as the reading of the scriptures, is that something that they have done individually?

THE JUROR: Yes. I mean, I just heard yell out, you know, read Deuteronomy, like 4:16, or something like that, and that's a good one to read, this one, and that one will make you think, or something like that.

At the conclusion of her examination, Juror S was sent to a separate jury room, and each of the other jurors was examined out of the presence of the other jurors. The trial judge asked whether they had personally seen, read, been confronted by or exposed to any materials or literature other than the testimony and evidence presented in the courtroom or any

discussions concerning the case besides jury deliberations at the conclusion of the guilt phase.

Ten of the jurors, including Jurors A, H, O, and the alternate, responded in the negative. Juror P qualified his response by saying that he had not seen anything "concerning this case or trial." Juror S was recalled to give a more detailed description of the pamphlet. The remaining eleven jurors and the alternate were then brought in separately and questioned specifically about the pamphlet. Eight, including Juror P, denied that a pamphlet or any other literature was passed around or discussed in the jury room. In the pertinent portions of their examination, the remaining four responded as follows.

### From the examination of Juror OR:

THE COURT: ... Have you since this trial began read a pamphlet entitled God's Word on Criminal Punishment?

THE JUROR: Yes, sir.

THE COURT: You have? Could you tell me what it says?

THE JUROR: I couldn't really remember what it said. I just was reading through it while we was waiting.

THE COURT: When was that?

THE JUROR: This morning.

Juror W stated that she had seen a pamphlet, but had neither seen the name on it nor held it. She recalled one juror saying to another "here, read, you know, you might want to read this," or something ...

### From the examination of Juror H:

THE COURT: Since the jury has been placed together and sequestered, have you read a pamphlet entitled God's word on Criminal Punishment?

THE JUROR: I've seen it floating around. I haven't actually read it myself.

THE COURT: You haven't read it.

THE JUROR: I have looked at it.

THE COURT: I beg your pardon?

THE JUROR: I have looked at it, but I haven't actually read it as far as reading it.

Juror O admitted obtaining the pamphlet **prior to seques-tration** from her "prayer partner," and stated that she had been reading it for reassurance that she was making the proper decision.

Appellant moved for a mistrial, asserting that the jurors had been less than truthful when first questioned, that at least four jurors had been tainted by the pamphlet, and that because Juror O had obtained the pamphlet prior to the commencement of trial, she harbored a bias toward guilt and capital punishment.[1] The trial judge removed Juror O from the jury, but denied the motion for a mistrial.

On appeal, appellant argues that the trial judge erred in allowing the trial to proceed with a jury whose deliberations had been tainted by the introduction of extraneous material. I agree.

I concur in so much of the majority's opinion as alludes to the criteria for a fair and impartial jury as set out in the Sixth and Fourteenth Amendments of the United States Constitution; *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); and S.C. Const. art. I, §§ 3, 14.

However, removing Juror O from the jury was inadequate to cure the prejudicial effect of the pamphlet. The record reflects that at least four jurors had involvement with the pamphlet. Excluding Juror O, two of the four admitted either looking at or reading through the pamphlet in the jury room. "It is fundamental that every litigant who is entitled to trial by jury is entitled to an impartial jury, free to the furthest extent practicable from extraneous influences that may subvert the fact-finding process." *Haley v. Blue Ridge Transfer Co.*, 802 F.2d 1532, 1534 (1986); *State v. Cameron*, 311 S.C. 204, 207, 428 S.E.2d 10, 12 (Ct.App.1993).

Where the misconduct involves the jurors' exposure to outside influences, the "cases are strongest in which the juror

---

1. We note that in his argument to the trial judge, counsel for appellant did not explicitly assert that the evidence showed that at least some of the jurors were engaging in premature deliberations. We view such misconduct as very serious; especially where, as here, the jury has been warned against it. *See, e.g., Gallman v. State*, 307 S.C. 273, 414 S.E.2d 780 (1992).

has lent himself to such influence as signified a willingness to receive advice or favors." *State v. Rowell,* 75 S.C. 494, 511, 56 S.E. 23, 29 (1906). Contrary to the majority's view, I find in this record ample evidence that the jury had access and exposure to the pamphlet throughout the morning. When the judge examined the jurors the second time, at least one juror besides Juror O admitted to "reading through the pamphlet while we were waiting," on the morning in question. Another "saw it floating around," turned a page or two and "saw" the captions; and a third juror "saw" the pamphlet. Not until after mid-day did one of the other jurors advise the judge of the pamphlet. Obviously, members of the jury were willing to receive the information and advice contained in the pamphlet.

Furthermore, the jurors were less than forthcoming when questioned by the judge. *Compare State v. Rowell, supra.* Their demeanor with regard to candor raises concern when viewed in connection with daily admonitions by the trial judge that the only thing they were "to consider is what they see and hear in that courtroom, nothing more and nothing less."

I would hold that the extraneous material in the jury room and the presence of Juror O throughout most of the proceedings so prejudiced the outcome of both phases of appellant's trial that a new trial is mandated. *State v. Wasson,* 299 S.C. 508, 386 S.E.2d 255 (1989). First, Juror O stated that she obtained the pamphlet prior to sequestration, which raises the stark implication that guilt was already presumed and that appellant's death sentence was a foregone conclusion as a result of the jury being tainted by the influence of Juror O and through its exposure to the pamphlet.

Second, the inordinate brevity of jury deliberations in this capital case under the circumstances here raises serious questions relating to the deliberative process. The jury required approximately thirty minutes to render the guilty verdict and less than two hours to return the death sentence. In my opinion, the record clearly infers that the jury was improperly influenced throughout its deliberations by Juror O and the author's views as expressed in the pamphlet.

The 31 page pamphlet, entitled *God, Law, and Capital Punishment,* by Richard W. De Haan, "teacher of the Radio Bible Class, worldwide ministry through radio, television, liter-

ature" bears a copyright date of 1974 and is a part of the record on appeal. Author De Haan makes an impassioned plea in favor of capital punishment and cites uncorroborated facts and unsubstantiated statistics to support his argument.

In my judgment, exposing appellant's jury to the pamphlet is tantamount to permitting an advocate of capital punishment to offer unauthorized evidence in circumvention of the constitution, statutory and common law, and the rules of court; to make unregulated rebuttal of evidence properly admitted at trial; and to present unrestrained argument in support of the death sentence.

In charging his interpretation of God's law on capital punishment, the author assumes the role of pre-eminent trial judge and implies that where there may be conflict between the law as charged by the state judge and that charged by the author, the author's instructions should be controlling. Mr. De Haan, through his pamphlet, is present in the jury room as a thirteenth juror deliberating upon evidence and the law received from two sources—the trial court and his pamphlet.

The following are excerpts from the pamphlet. "Over the past decade, nearly 300 policemen have been killed while performing their duties." (pg. 1) Quoting the distraught father of a girl who had been raped and murdered, "This sort of thing has happened all too often, and must be stopped!" (pg. 2)

I find it difficult to minimize the prejudicial effect of the following comments upon the emotions of a jury considering the guilt and punishment of a defendant on trial for his life.

Whenever this principle of an "eye for an eye ..." is followed by a society, mankind is bettered. God is pleased when this expression of His will [capital punishment] is carried out ... (pg. 13) We must not fail to carry out the proper sentence [capital punishment] ... (pg. 14)

He has given specific demands for the punishment of those who break these laws, including the death penalty for deliberate murder.... The Lord in His perfect holiness and justice therefore has ordained that the deliberate killer must pay for his crime by forfeiting his own right to life. (pp. 18–19) Government must see to it that God's principles

are in force, and this includes capital punishment for willful murder. (p. 21)

... In 1966 and 1967, when the death penalty was still on the books in our country, not one policeman was killed from ambush. But during the 4 years from 1968 through 1971, after capital punishment was no longer a threat, 49 policemen died as a result of being shot down....

The price of leniency toward murderers is heavy.... Hundreds of people have been slain by men released after serving time for a murder conviction. J. Edgar Hoover told a congressional subcommittee that 19 men who killed policemen from 1960 to 1970 had previously been convicted of first-degree murder.

In conclusion, then, capital punishment is reasonable and fair. It meets God's holy demands of justice ... Most important of all, it is commanded by God. Through revelation He established it as the way to deal with killers. He expects every society to carry it out, and is displeased when a community disregards this important obligation.

Mr. De Haan concludes the chapter with a cautionary note to the jury. "Let me ask you a personal question. Are you prepared for the day you must stand before God's tribunal? His judgments are always fair, and He never makes mistakes." (pp. 21–23)

The trial court is under an obligation to safeguard the right to trial by an impartial jury throughout the proceedings. The right to an impartial jury is not satisfied until the collective judgment of the jury is the product of a trial by an impartial trier of fact, capable and willing to follow the law and render an impartial verdict on the evidence. 50A C.J.S. *Juries* § 225.

Although this dissent is specific as to Issue I of appellant's appeal, insofar as it relates to the impartiality of appellant's trial jury, reference is made to Issue II. The record reflects that while he was a student in 1986, Juror P led a group of 40 students on a trip to Columbia to support the execution of Terry Roach. Voir dire examination for appellant's jury did not specifically address Juror P's participation in a death penalty rally and the facts were not divulged prior to trial. When questioned about his "position" on the death penalty,

Juror P admitted that he had thought about the death penalty, but indicated that he could be fair and impartial.

After the jury returned appellant's sentence, a newspaper quoted Juror P as saying, "I think the only thing I regret is that [appellant] has only one life to give for the two he took." When considered in its totality, the compelling conclusion is that the outcome of both phases of appellant's trial was influenced by cumulative bias on the part of his jury.

I find that the interjection of extraneous facts and editorial comments into the jury's deliberations created bias and prejudice against the appellant and affected the ability of the jury to render fair and impartial verdicts at both phases of appellant's bifurcated trial. I would reverse appellant's conviction and death sentence and remand for a new trial.

TOAL, J., concurs.