514 S.E.2d 578

**The STATE, Respondent,**

v.

**Russell Nelson KING, Appellant.**

**No. 24916.**

Supreme Court of South Carolina.

Heard Nov. 18, 1998.

Decided March 8, 1999.

Rehearing Denied April 8, 1999.

506

John D. Delgado, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney

General Donald J. Zelenka, Assistant Attorneys General Lauri J. Soles and S. Creighton Waters, all of Columbia; and Solicitor Dudley Saleeby, Jr., of Florence, for respondent.

BURNETT, Justice:

Appellant appeals his convictions for murder, arson and armed robbery. We reverse.

## FACTS

Appellant lived in Mullins, South Carolina with his wife and three children. Appellant's father-in-law, Billy Turbeville, moved in with appellant's family after Mr. Turbeville and his wife divorced in 1989. Mr. Turbeville had suffered a stroke in 1987 and could no longer live alone. Mr. Turbeville lived in an apartment which had been added to the King's home, and he paid the second mortgage the Kings had obtained to build the apartment.

At approximately 5:20 a.m. on the morning of March 10, 1995, appellant woke his wife when he discovered Mr. Turbeville's apartment was on fire. Because the apartment's door was locked, appellant broke a window in the door and reached through to open the door. Appellant and his wife ran into the apartment several times searching for Mr. Turbeville. The apartment was filled with smoke and they were unable to locate him. Officer Jimmy Collins testified, when he arrived, appellant was upset and said his father-in-law might be inside, but the smoke was too thick.

Once the fire department extinguished the fire and the smoke was blown from the apartment, the body of Mr. Turbeville was found on the floor beside his bed. Mr. Turbeville had been burned and beaten on the head with a blunt object such as a hammer.[1] He had nine lacerations to the scalp. A pool of blood was discovered just inside the apartment door, more than nine feet from the body. Another pool of blood was discovered under Mr. Turbeville's head. The authorities seized the trousers appellant was wearing when he entered Mr. Turbeville's apartment. Examination of the trousers

---

1. The weapon was never found.

revealed spatters of blood on the leg and crotch. DNA analysis revealed the blood to be Mr. Turbeville's.

Gasoline-soaked newspapers and paper towels were found in the apartment. A gasoline-soaked newspaper was found in the recycling bin inside the Florida room of the King home. The Florida room is located at the back of the house facing Mr. Turbeville's apartment. Authorities seized a gas can found in the garage and another found in the back of appellant's truck.

Appellant's ex-wife, Gina Turbeville–King,[2] testified her father usually went to the Huddle House restaurant at approximately 3:30 a.m. A witness testified Mr. Turbeville was at the Huddle House on the morning of March 10, 1995, and left the restaurant at approximately 4:45 a.m.

Mr. Turbeville received two checks each month totaling $2200.00. After paying his bills totaling $400.00, Mr. Turbeville kept the remaining cash in his wallet. A witness from the Huddle House testified Mr. Turbeville carried money in his front pants' pocket. No wallet or cash was found on Mr. Turbeville's body. Mrs. King testified her father's VCR was missing after the fire. Authorities never found the missing VCR or money.

Mrs. King testified, on the evening before the murder, she returned to her home at approximately 9:00 p.m. As she arrived home, she was surprised to see appellant pulling into the driveway because he was suppose to be home with the children. Later that evening, Mrs. King discovered approximately $70.00 was missing from her purse. When she confronted appellant, he first denied and then admitted taking the money. Appellant left the house around 1:00 a.m. telling his ex-wife he was going to get some money to repay her. Appellant returned home at approximately 2:00 a.m. and got into bed with his ex-wife. He again got out of bed a short while later and returned to bed around 3:00 a.m. Mrs. King next remembered appellant yelling to her about the fire. Mrs. King testified appellant had told her she was to agree that she heard someone come into their yard that night and argue with

2. Mrs. King divorced appellant in 1996.

her father.[3]  According to Mrs. King, appellant had threatened to take the children if she did not agree with his story. Mrs. King testified she had not heard anything.

Frank Robinson, an acquaintance of appellant, testified appellant had come to his home at "around 11:00 p.m. or 12:00 a.m." the night of the murder to ask Robinson if someone had paid in advance for work appellant was to do for this person. Robinson told appellant he had not yet received the advanced payment.  A few hours later, around 3:00 a.m., appellant returned to Robinson's home asking to borrow $7.00 for gasoline.  Robinson told him to return later in the morning. When appellant came back between 7:00 and 8:00 a.m., he told Robinson his father-in-law "got burned last night."

## ISSUES

I.  Did the trial judge err in refusing to grant a new trial after a television news reporter entered the courtroom midway through the jury charge and filmed the judge, parties, and jury?

II.  Did the trial judge err in allowing appellant's ex-wife to testify regarding appellant's need for money prior to the murder because this testimony served no purpose other than to impugn appellant's character and its prejudicial effect outweighed any probative value?

## DISCUSSION

### I.

■ Immediately before beginning closing arguments, the trial judge ordered the bailiff not to allow anyone "to leave or reenter [the courtroom] once the arguments begin or [during] the charge of the law."  In the middle of the judge's charge to the jury, a television news reporter entered the courtroom. With the use of a video camera, the reporter filmed the proceedings until the end of the jury charge.

Appellant did not object to this situation prior to the jury's verdict.  Instead, appellant raised this issue three days later in his post trial motion for a new trial.  During the post trial

---

3.  Her father's stroke severely affected his ability to speak.

motions' hearing, defense counsel admitted he discussed the situation with appellant and appellant's father prior to the verdict and "a conscious decision [was] made not to make a motion for a mistrial." Only after the jury returned with an unfavorable verdict did defense counsel attempt to raise this issue.

In denying the new trial motion, the trial judge found appellant had waived this claim because his objection was not timely. Further, the trial judge found the reporter's activities were in accordance with Rule 605, SCACR, and did not distract or disrupt the proceedings.

We conclude appellant waived review of this issue by failing to object prior to the jury's verdict. Rule 103(a)(1), SCRE; *State v. Hicks*, 330 S.C. 207, 499 S.E.2d 209 (1998) (to preserve an issue for appellate review, the objection must be timely made, which usually requires it be made at the earliest possible opportunity); *see also State v. Kelly*, 331 S.C. 132, 502 S.E.2d 99 (1998) (a new trial motion may not be used to raise an evidentiary issue for the first time); *McGee v. Bruce Hosp. Syst.*, 321 S.C. 340, 468 S.E.2d 633 (1996) (an issue may not be raised for the first time in a motion for a new trial); *State v. Penland*, 275 S.C. 537, 538, 273 S.E.2d 765, 767 (1981) (finding appellant waived the issue where he did not make a motion for a mistrial until after the verdict).

Defense counsel, after consultation with appellant, made a strategic trial decision not to object. Appellant and defense counsel weighed their options and, rather than moving for a mistrial, decided to take the chance appellant would be acquitted. Under these facts, appellant has no basis on which to assert error.

*II.*

■ Appellant's ex-wife, Gina Turbeville–King, testified for the State. She testified she and appellant first separated in October 1994. They reconciled in January 1995 and separated again shortly after the murder. The State, in an attempt to elicit testimony of appellant's recent drug use, asked Mrs. King if "[a]ny changes in [appellant had taken] place then that lead [sic] to that separation?" Defense counsel objected on the basis of relevance. After an *in camera* hearing, the trial

judge sustained the objection and ruled the State could not introduce evidence of appellant's drug addiction.

The State then requested permission to elicit testimony to show appellant had a pattern of taking money from his ex-wife and staying out late to prove motive and/or to establish the context of the crimes under the *res gestae* theory. The prosecution indicated it would not discuss appellant's drug use. Defense counsel objected claiming these were inadmissible prior bad acts. The court overruled the objection explaining the evidence was relevant to establish appellant's need for money and the prejudicial effect of this evidence did not outweigh its probative value.[4]

Before the jury, the State asked Mrs. King whether any changes in appellant's conduct led to the separation. Mrs. King responded appellant had been staying out late and he would leave several times during the night.

The State then asked Mrs. King about appellant's need for money. She testified appellant had admitted taking items from their home, pawning them, then redeeming them and returning them to the home. Mrs. King also testified appellant stole cash from her purse, forged checks on her bank account, stole cash from her bank account by using her ATM card, and stopped paying his share of the bills. These incidents occurred prior to their separation in October 1994 and began to occur again after they reconciled in January 1995. Mrs. King testified their financial situation had not changed during this time.

Mrs. King then testified appellant stole $70 from her purse on the evening before the murder. According to Mrs. King, when she confronted appellant he first denied, then admitted, taking the money. Mrs. King testified appellant promised to repay her. After this confrontation, appellant left the house at approximately 1:00 a.m. He returned around 2:00 a.m. Later, he got up from bed and returned around 3:00 a.m. Mrs. King testified she was not aware of appellant leaving the bed again until he woke her yelling there was a fire.

---

4. The trial judge assured defense counsel that his objection would run throughout Mrs. King's testimony and it would be unnecessary to continue to object.

Appellant argues the trial judge erred in admitting Mrs. King's testimony regarding his prior bad acts of stealing because this testimony only served to establish his criminal propensity to commit the charged crimes and he is a bad person. The State argues this testimony was admissible to establish motive and/or to provide the context of the crimes.

In a criminal case, the State cannot attack the character of the defendant unless the defendant himself first places his character in issue. Rule 404(a), SCRE; *Mitchell v. State,* 298 S.C. 186, 379 S.E.2d 123 (1989). Further, evidence of prior bad acts is inadmissible. to show criminal propensity or to demonstrate the accused is a bad person. *Mitchell v. State, supra.*

South Carolina law precludes evidence of a defendant's prior crimes or other bad acts to prove the defendant's guilt for the crime charged except to establish (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan, or (5) the identity of the perpetrator. Rule 404(b), SCRE; *State v. Adams,* 322 S.C. 114, 470 S.E.2d 366 (1996); *State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923). The evidence of the prior bad acts must be clear and convincing to be admissible. *State v. Adams, supra.* The record must support a logical relevance between the prior bad act and the crime for which the defendant is accused. *State v. Adams, supra; State v. Smith,* 309 S.C. 442, 424 S.E.2d 496 (1992); *State v. Gilchrist,* 329 S.C. 621, 496 S.E.2d 424 (Ct.App.1998). Further, even though the evidence is clear and convincing and falls within a Lyle exception, it must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Rule 403, SCRE; *State v. Adams, supra.*

The *res gestae* theory recognizes evidence of other bad acts may be an integral part of the crime with which the defendant is charged, or may be needed to aid the fact finder in understanding the context in which the crime occurred. *State v. Adams, supra.* This evidence of other crimes is admissible:

> when such evidence "furnishes part of the context of the crime" or is necessary to a "full presentation" of the case, or is so intimately connected with and explanatory of the crime

charged against the defendant and is so much a part of the setting of the case and its "environment" that its proof is appropriate in order "to complete the story of the crime on trial by proving its immediate context or the 'res gestae'" or the "uncharged offense is 'so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other . . .' [and is thus] part of the res gestae of the crime charged." And where evidence is admissible to provide this "full presentation" of the offense, "[t]here is no reason to fragmentize the event under inquiry" by suppressing parts of the "res gestae."

*State v. Adams*, 322 S.C. at 122, 470 S.E.2d at 370–71 (quoting *United States v. Masters*, 622 F.2d 83, 86 (4th Cir.1980) (citations omitted)). The evidence of prior bad acts is inadmissible as part of the *res gestae*, "where the record does not support any relationship between the crime and [prior bad acts]." *State v. Hough*, 325 S.C. 88, 480 S.E.2d 77 (1997). Under this theory, it is important that the temporal proximity of the prior bad act be closely related to the charged crime. *State v. Hough, supra*. Even if the evidence is relevant under this theory, prior to admission the trial judge should determine whether its probative value clearly outweighs any unfair prejudice. Rule 403, SCRE; *State v. Bolden*, 303 S.C. 41, 398 S.E.2d 494 (1990).

For purposes of this discussion we have divided the evidence presented by the State into two categories: (1) the evidence of his numerous prior thefts from his ex-wife beginning in 1994 (remote thefts) and (2) the evidence of the theft on the night before the murder (immediate theft). The remote thefts were not admissible under any theory. This evidence shows appellant's bad character and his propensity to commit crimes. These are inadmissible purposes. The temporal connection between these petty thefts and the charged crimes is too attenuated for admissibility under the *res gestae* theory or under *Lyle*.[5] Thus, the trial judge erred in admitting evidence of the remote thefts.

---

5. While the remote thefts may have been minimally relevant to show motive under *Lyle*, the prejudicial effect of this evidence far outweighed this slight probative value.

514

■ In our opinion, the admission of this evidence is not harmless beyond a reasonable doubt.[6] *State v. Bolden, supra.* Whether the improper introduction of this evidence is harmless requires the Court to determine whether appellant's "guilt is conclusively proven by competent evidence, such that no other rational conclusion could be reached." *State v. Parker,* 315 S.C. at 234, 433 S.E.2d at 833; *see also State v. Reeves,* 301 S.C. 191, 194, 391 S.E.2d 241, 243 (1990) (finding an error is harmless if it could not reasonably have affected the result of the trial); *State v. Davis,* 309 S.C. 326, 422 S.E.2d 133 (1992) (even if evidence was wrongly admitted, its admission may constitute harmless error if the evidence did not affect the outcome of the trial).

Here, all the evidence was circumstantial. While this circumstantial evidence pointed to appellant's guilt, especially the blood evidence, the evidence was not overwhelming. The admission of the remote thefts was too prejudicial to be held harmless. The admission of this testimony allowed the State to insinuate to the jury that appellant had a drug problem. The Solicitor's questions eliminated many legitimate reasons why appellant would need money. In the State's closing argument, the Solicitor's use of words such as "craving" and "insatiable" implied to the jury that appellant's reason for needing money was bad and was probably related to an illegal activity—drug use. Appellant's drug use was properly found inadmissible by the trial judge because of its prejudicial effect. However, by way of the back door, the State was able to introduce appellant's drug problem to the jury.

This improper evidence suggested to the jury that appellant was guilty of committing the charged crimes because of his criminal propensity to commit crimes and his bad character. The State continuously stressed this improper testimony in its

---

6. The State suggests any error in the admission of this evidence is harmless beyond a reasonable doubt because Mrs. King's testimony was cumulative to Robinson's testimony about appellant's need for money. We disagree. Robinson's testimony only established appellant had asked to borrow money from Robinson in the past and on the night of the murder. There was no suggestion that appellant had attempted to steal money. Mrs. King's testimony established appellant stole money from her and pawned household items for money. Her testimony was much more damaging to appellant. Thus, her testimony was not cumulative to Robinson's testimony.

closing argument. Therefore, it is impossible under these circumstances to conclude the improper evidence did not impact the jury's verdict. This improper testimony permeated the trial and the jury likely used this evidence to infer that since appellant had previously stolen from his ex-wife, he probably committed these crimes against his father-in-law also. *See State v. Hough, supra.*

Because analysis of the immediate theft is unnecessary for the resolution of this case, we decline to address it.

**REVERSED.**

FINNEY, C.J., TOAL and MOORE, JJ., and Acting Associate Justice GEORGE T. GREGORY, Jr., concur.