Steven Wayne Bowman was convicted murder by jury in the Circuit Court of 
Edgefield County

THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE 
 CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 
 239(d)(2), SCACR. 
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
The State,       
Respondent,
 
 
 

v.

 
 
 
Steven Wayne Bowman,       
Appellant.
 
 
 

Appeal From Edgefield County
Marc H. Westbrook, Circuit Court Judge

AFFIRMED

Unpublished Opinion No. 2004-UP-158
Submitted January 12, 2004  Filed March 
 10, 2004

 
 
 
Assistant Appellate Defender Robert M. Dudek, of Columbia, 
 for Appellant.
Attorney General Henry Dargan McMaster, Chief Deputy 
 Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald 
 J. Zelenka, Assistant Attorney General S. Creighton Waters, all of Columbia; and Solicitor 
 Donald V. Myers, of Lexington, for Respondent.
 
 
 

PER CURIAM:  Steven Wayne Bowman appeals 
 his conviction for murder, claiming the trial court improperly admitted evidence 
 of a prior bad act.  We affirm.
FACTS
In the early morning of October 26, 
 2000, Jean Holmes drove past her son Phillips home in Edgefield County on the 
 way to work.  As she was driving, she noticed her sons vehicle was still parked 
 in the driveway.  When she stopped to investigate, she saw what she thought 
 was a mummy.  As she approached the body, she discovered it was her son.  
 An investigation revealed that Phillip had been shot twice in the upper body.  
 His body had also been partially burned.
Prior to his death, Holmes had been involved in 
 a relationship with Debi Blankenbecker.  They had been dating since January 
 2000.
Blankenbecker testified she had an affair with 
 Bowman several years earlier, and that Bowman became extremely jealous of her 
 new relationship with Holmes.  She claimed Bowman committed several threatening 
 and violent acts against her from February to October 2000.  For example, Blankenbecker 
 claimed:  Bowman made threatening calls demanding that she stop seeing Holmes; 
 Bowman trashed her house on one occasion; Bowman had attempted to carry her 
 away; her ribs and chest were injured after a violent episode during which 
 Bowman washed her mouth out with soap after she spoke of Holmes; and Bowman 
 broke into her home at night, entered her bedroom, and demanded sex. 
The crux of the present controversy 
 concerns Blankenbeckers testimony regarding the incident in July 2000 in which 
 she claimed Bowman broke her ribs.  On direct examination at trial, Blankenbecker 
 initially described what happened that day.  She testified that she and Bowman 
 got into a fight while returning from a trip they had taken together to Atlanta, 
 Georgia.  They returned to Bowmans house against her wishes.   She claimed 
 that Bowman ripped the phone out of the wall so I couldnt call anybody.   
 The solicitor then asked Blankenbecker: Now, while there at his home, did you 
 receive some injuries to your ribs?  Thats all I want to know.  Did you receive 
 some injuries to your ribs?  She responded: Yes, I did.   Blankenbecker further 
 testified that she asked Bowman if she could call Holmes, at which point Bowman 
 put soap in her mouth and told her not to mention [Holmess] name in his house.   
 The examination regarding this event then concluded as follows:

Solicitor:                    
 Also during this same night, was there a bruise on your chest area?
Blankenbecker:          Yes.
Solicitor:                    
 Did the Defendant tell you that you should show that bruise to anyone?
Blankenbecker:          Yes.  
 He said, You can show this to [Holmes]. 

Defense counsel did not object to any of this testimony.
A few minutes later, the solicitors 
 examination turned to another topic.  Blankenbecker was asked when she had last 
 heard from Bowman.  She responded: I had not heard very much from him since 
 July 5th, since he broke my ribs. Defense counsel immediately objected, arguing 
 testimony from a witness regarding a prior bad act of a defendant that is not 
 directly related to the deceased is not admissible and that a mistrial should 
 be declared.  The solicitor responded that the testimony was not offered to 
 show the character of Bowman, but rather offered to show Bowmans malice and 
 animus toward the victim.   The trial court denied defense counsels request 
 for a mistrial, finding the probative value of the testimony outweighed any 
 harm that may have been done by the statement.   The court then instructed the 
 jury that it should not consider Blankenbeckers statement as a reflection of 
 the defendants character, but only as an explanation of events that had occurred.
The State continued its case and presented 
 evidence in an attempt to connect Bowman to the murder.  The night before the 
 murder, Bowman borrowed his fathers Dodge Dakota truck.  According to investigators, 
 the trucks engine was very loud.  A neighbor of Holmes testified that at 
 approximately 12:15 to 12:30 a.m. on October 26, 2000, he heard three gunshots.  
 At approximately 12:55 a.m, he saw a truck driving down the road at a high 
 rate of speed.  He noted the trucks engine was so loud that it rattled the 
 windows.    
Two other neighbors of Holmes 
 testified that a week before the murder they saw a man, who they later identified 
 as Bowman, jump out of ditch and run to a car parked near Holmess house.  
 A map of Edgefield County found in Bowmans car was admitted into evidence.  
 The map had Bowmans fingerprints on it, some of which were located right below 
 the area depicting the roads around Holmess house.
The State also called Vicky Redfern 
 as a witness.  Redfern, a co-worker who had dated Bowman, testified that a week 
 before the murder Bowman asked to borrow her Ruger .357 pistol to practice for 
 a hunting trip.  Redfern loaned him the weapon and gave him three bullets.  
 The night of the murder Bowman left work with Redfern.   She testified 
 Bowman asked her to cover for him because a man named Phillip had been killed 
 in Edgefield and he did not have an alibi.  He told her that Phillip 
 had been dating a girl that he used to date and that he and Phillip had had 
 verbal confrontations.  According to Redfern, Bowman admitted killing 
 Holmes, but recanted shortly thereafter.   Redfern testified that when 
 she asked Bowman for her gun, he told her she could not have it because he had 
 used it.   
 A security guard at Bowmans work testified 
 that when Bowman walked through his security station in the early morning of 
 October 26, 2000, he detected the smell of burnt leaves or barbeque.   An 
 inmate incarcerated with Bowman at the Edgefield County Jail testified Bowman 
 told him that he had told this girl that he had committed the murder but recanted.  
 Bowman also said that the authorities would never find the murder weapon in 
 South Carolina.  
 Bowman presented several witnesses.  
 Three witnesses, who officiated high school football with Bowman, testified 
 Bowman acted normally the weekend after the murder.  In an effort to explain 
 the Edgefield County map that was admitted into evidence, a friend of Bowmans 
 who was a federal inmate in Edgefield County testified Bowman was planning to 
 visit him.  Additionally, a mechanic testified regarding the exhaust system 
 in Bowmans fathers truck.  He testified the original muffler on the truck 
 had not been altered.
Bowman testified in his own defense. 
  Although his testimony was lengthy, Bowman essentially testified he 
 was being sarcastic when he told Redfern that he had committed the murder.  
 He denied committing the murder.   He explained that the night of the murder 
 he borrowed his fathers truck because he thought he was going to transport 
 items to work for Redfern.   He testified that night he went to his work 
 to talk with Redfern who ended her day around 10:30 p.m.  When he arrived around 
 11:25 p.m., he discovered that she was not there.  He then went to a nearby 
 Waffle House and Wal-Mart.  Afterwards, he drove to Redferns house and arrived 
 around 12:40 a.m., but did not go in because her lights were off.   He then 
 decided to go back to work to get caught up.  He testified his previous work 
 week had included the 11:00 p.m. to 7:30 a.m. shift.  After working for 
 a while, Bowman left work around 2:40 a.m.  
In reply, the State presented an employee 
 where Bowman worked who testified that the night of the murder Bowman went through 
 security at 1:55 a.m. and logged on his computer at 2:05 a.m.  A SLED agent 
 also testified to inconsistencies in Bowmans statements.
The jury convicted Bowman of murder.  
 The trial court sentenced Bowman to life imprisonment without parole.  Bowman 
 appeals.
DISCUSSION
Bowman argues the 
 trial court erred in admitting Blankenbeckers statement that I had not heard 
 very much from him since July 5th, since he broke my ribs.  Specifically, Bowman 
 claims the probative value of this statement did not outweigh its unduly prejudicial 
 effect, particularly where the States case was entirely circumstantial.  We 
 disagree. 
In reviewing the trial courts decision 
 to admit evidence of a defendants prior bad acts, our scope of review is limited 
 to determining whether there is any evidence reasonably supporting the trial 
 courts decisions. State v. Wilson, 345 S.C. 1, 6, 545 S.E.2d 827, 829 
 (2001).  If there is any evidence to support the admission of the bad act evidence, 
 the trial judges ruling will not be disturbed on appeal. Id. (noting 
 in footnote that [a]lthough we have never articulated this standard of review 
 in the context of bad act evidence, we have in fact applied it on review of 
 such cases; citing four previous Supreme Court decisions applying the any 
 evidence standard of review in cases analyzing the admissibility of prior bad 
 acts).
As a general rule, [e]vidence of other 
 crimes, wrongs, or acts is not admissible to prove the character of a person 
 in order to show action in conformity therewith. Rule 404(b), SCRE; see 
 State v. Jenkins, 322 S.C. 414, 416, 472 S.E.2d 251, 252 (1996) (stating 
 evidence of other crimes, wrongs, or acts is not admissible to prove a defendant 
 committed the specific crime charged).  However, evidence of other crimes, wrongs, 
 or acts is admissible if it tends to establish motive, intent, the absence of 
 mistake or accident, identity, or the existence of a common scheme or plan. 
 Rule 404(b), SCRE; Anderson v. State, 354 S.C. 431, 435, 581 S.E.2d 834, 
 835-36 (2003) (Rule 404, SCRE, the modern expression of the Lyle rule, 
 excludes evidence of other crimes, wrongs, or acts offered to prove the character 
 of a person in order to show action in conformity therewith.  The rule creates 
 an exception when the testimony is offered to show motive, identity, the existence 
 of a common scheme or plan, the absence of mistake or accident, or intent. 
 (quoting Rule 404(b), SCRE)).  
To admit evidence of prior bad acts, there must 
 be a logical relevance between the acts in question and the purpose for introduction.  
 State v. Lyle, 125 S.C. 406, 416, 118 S.E. 803, 807 (1923); State 
 v. King, 349 S.C. 142, 153, 561 S.E.2d 640, 645 (Ct. App. 2002).  Even if 
 the prior crime evidence is relevant, it must be excluded if its probative value 
 is substantially outweighed by the danger of unfair prejudice to the defendant. 
 Rule 403, SCRE; State v. King, 334 S.C. 504, 512, 514 S.E.2d 578, 582 
 (1999).
Generally, it is improper to introduce incidents 
 of violence involving the defendant and someone other than the decedent. See 
 State v. Braxton, 343 S.C. 629, 634-36, 541 S.E.2d 833, 836 (2001) (holding 
 evidence of an argument between defendant and his brother the night before the 
 victims murder was inadmissible character evidence); cf. State v. 
 Taylor, 333 S.C. 159, 168, 508 S.E.2d 870, 874 (1998) (In homicide cases, 
 evidence that the accused and the decedent had previous difficulty is admissible.  
 The evidence is admissible to show the animus of the parties and to aid the 
 jury in deciding who was the probable aggressor.). 
The instant case, however, is distinguishable given 
 the interrelationship between Bowman, Blankenbecker, and Holmes.  Evidence was 
 presented at trial demonstrating the violence Bowman inflicted on Blankenbecker 
 was directly related to Bowmans envy and ill feelings toward Holmes. This evidence 
 is sufficient to support a finding that Bowmans act of breaking Blankenbeckers 
 ribs was part of a series of violent acts committed by Bowman, all of which 
 involved his hatred for Holmes.  Thus, the evidence was admissible to show Bowmans 
 motive and animus with regard to the victim.  See State v. Alford, 
 264 S.C. 26, 32, 212 S.E.2d 252, 254 (1975) (Evidence is inadmissible to show 
 a difficulty between accused and a third person in no way connected with the 
 victim or offense . . . However, where [the] connection with the offense sufficiently 
 appears, evidence of prior difficulties between accused and a third person is 
 admissible to show malice, premeditation, or general state of mind, as is evidence 
 . . . that accused had a grudge against the companion of the victim at the time 
 of the assault. (quoting 40 C.J.S. Homicide § 209 (pre-cursor to 41 
 C.J.S. Homicide § 207 (1991))); see also Mitchell v. United 
 States, 629 A.2d 10, 13-14 (D.C. 1993) ([W]e have also recognized that 
 the web of spousal discord often entangles third parties, and accordingly, have 
 extended the scope of the motive exception to allow evidence showing wrongful 
 acts against the spouse when the ultimate crime was committed against a third 
 party . . . [F]or admissibility determinations under the motive exception, 
 we see no reason to artificially distinguish between those situations where 
 the victim of the initial wrongful conduct and the ultimate crime are identical, 
 and where the ultimate victim is a third party with a clear nexus to the initial 
 misconduct.). [1] 
Even assuming the court erred in admitting 
 Blankenbeckers testimony, any error in its admission was harmless.  As described 
 above, the brief statement regarding the injury to Blankenbeckers ribs that 
 prompted defense counsels objection occurred after earlier, more extensive 
 testimony on the same incident. That testimony and the testimony of Blankenbecker 
 regarding numerous other violent acts directed against her was admitted without 
 objection.  Viewed in context, therefore, the statement that is the subject 
 of this appeal was merely cumulative.  Thus, its admission did not constitute 
 reversible error.  See State v. Haselden, 353 S.C. 190, 196, 577 
 S.E.2d 445, 448 (2003) (stating the erroneous admission of prior bad act evidence 
 is harmless beyond a reasonable doubt if its impact is minimal in the context 
 of the entire record); State v. Schumpert, 312 S.C. 502, 507, 435 S.E.2d 
 859, 862 (1993) (finding any error in admission of evidence cumulative to other 
 unobjected-to evidence is harmless).
Accordingly, we find the trial court 
 did not abuse its discretion in admitting Blankenbeckers statement regarding 
 Bowmans prior bad act.  Additionally, even if it had been error to admit this 
 testimony, the error was a harmless one, not warranting the intervention of 
 this Court.  We affirm Bowmans murder conviction and sentence.
 AFFIRMED. 
GOOLSBY and ANDERSON, JJ., and CURETON, 
 AJ., concur.

 
 
 [1]    To the extent Bowman argues the evidence was inadmissible because 
 it was too remote in time to the homicide, we find this argument is not preserved 
 for our review because it was not raised at trial.  See State v. 
 Byram, 326 S.C. 107, 113, 485 S.E.2d 360, 363 (1997) (stating to be preserved 
 for appellate review, an issue must be raised to and ruled on by the trial 
 judge).  In any event, the remoteness did not negate the relevance of the 
 evidence.  See Commonwealth v. Pacell, 497 A.2d 1375, 1378 (Pa. 
 Super. Ct. 1985) (finding evidence that defendant struck common-law wife five 
 days before the murder of wifes paramour was relevant to defendants motive, 
 and remoteness did not vitiate relevance given incident was part of the sequence 
 of events leading directly to the homicide).