684 S.E.2d 168

**Louis M. JAMISON and Evelyn Jamison, Respondents,**

**v.**

**John M. MORRIS and Kevin Morris d/b/a Morris Texaco Mini Mart, Anderson Oil Co. Inc., Texaco, Inc., and Shell Oil Company, Defendants,**

**of whom John M. Morris and Kevin Morris d/b/a Texaco Mini Mart, Anderson Oil Co. Inc., and Texaco, Inc. are the Appellants.**

No. 26720.

Supreme Court of South Carolina.

Heard June 23, 2009.

Decided Sept. 21, 2009.

Rehearing Denied Nov. 4, 2009.

218

C. Mitchell Brown, William C. Wood, Jr., A. Mattison Bogan and Elizabeth H. Campbell, all of Nelson, Mullins, Riley & Scarborough, of Columbia; Rebecca Laffitte, and Robert E.

Horner, both of Sowell, Gray, Stepp & Lafitte, all of Columbia; Robert D. Hays, Matthew S. Harman, and W. Ray Persons, all of King & Spalding, of Atlanta; and Robert H. Hood, Deborah H. Sheffield, and James B. Hood, all of Hood Law Firm, of Charleston, for Appellants.

John H. Tiller and Wendy J. Keefer, of Haynsworth Sinkler Boyd, of Charleston, for Appellants.

Matthew Terry Richardson, of Wyche, Burgess, Freeman & Parham, of Columbia; Nicholas Clekis, of Clekis Law Firm, of Charleston; Richard Ness, of Ness & Jett, of Bamberg; Richard S. Rosen and Alex B. Cash, both of Rosen, Rosen & Hagood, of Charleston; Wallace K. Lightsey and Meliah D. Bowers, both of Wyche, Burgess, Freeman & Parham, of Greenville; and William T. Toal and I.S. Leevy Johnson, both of Johnson, Toal & Battiste, of Columbia, for Respondents.

Alphonse M. Alfano, of Bassman, Mitchell & Alfano, of Washington; Charles E. Carpenter, Jr. and Carmen V. Ganjehsani, both of Carpenter Appeals & Trial Support, of Columbia; Daniel Scott Haltiwanger, of Richardson, Patrick, Westbrook & Brickman, of Barnwell; David J. Kaufmann and Kevin M. Shelley, both of Kaufmann, Feiner, Yamen, Gildin & Robbins, both of NY; Douglas S. Kantor and Michael J. Baratz, both of Steptoe & Johnson, of WA; J.R. Murphy and Jeffrey C. Kull, both of Murphy & Grantland, of Columbia; John Thomas Lay, of Ellis, Lawhorne & Sims, of Columbia; Victor E. Schwartz and Cary Silverman, both of Shook, Hardy & Bacon, of Washington; William Cleveland, of Buest, Moore, Smythe & McGee, of Charleston; William Sweeny, III, of Sweeny, Wingate & Barrow, of Columbia; William Lloyd Taylor, of Taylor & Powell, of Kiawah Island, and Robert M. Roach, Jr., of Roach & Newton, of Houston, Texas, all for Amici Curiae.

Justice PLEICONES.

Appellants appeal from a jury verdict finding appellant Mini Mart liable, and appellants Anderson Oil and Texaco, Inc., vicariously liable, for catastrophic injuries suffered by respondent Louis Jamison (Louis) in a one vehicle automobile accident. We reverse the vicarious liability verdicts against Anderson Oil and Texaco, finding no evidence that Mini Mart

was their actual agent for purposes of the sale of alcohol to the driver of the car in which Louis was a passenger. We hold that the erroneous admission of expert testimony predicated on unreliable evidence requires reversal of the verdict against Mini Mart.

## FACTS

Louis suffered serious injuries rendering him a quadriplegic when he was involved in a one car accident while he was a passenger in a car driven by his nineteen year old cousin Carlos Davis. Carlos, who died as the result of the accident, was allegedly intoxicated at the time of the accident as the result of drinking beer he was alleged to have illegally purchased from appellant Morris' Texaco Mini Mart (Mini Mart). Mini Mart, a Texaco-branded service station, received its gasoline from appellant Anderson Oil Company (Anderson), which in turn purchased Texaco branded gasoline pursuant to a contract between it and Star Enterprises. Anderson is what is known in the industry as a "jobber." Prior to the alleged alcohol sale to Carlos in 2000, the Anderson/Star contract was assigned to Motiva,[1] an L.L.C. created under the laws of Delaware. Motiva is a joint venture between appellant Texaco (Texaco) and Saudi Aramco.

Louis, who was seventeen at the time of the automobile accident, and his mother (Respondent Evelyn Jamison)[2] sued the appellants. The jury returned a verdict against all three for $30 million actual damages finding Mini Mart negligent and Anderson and Texaco vicariously liable, which verdict was reduced to $27 million as the jury found the appellants 90 % at fault and Louis 10% at fault under comparative negligence principles. Mini Mart, Anderson, and Texaco appeal.

## ISSUES

1. Did the trial judge err in denying Anderson's and Texaco's motions for a directed *verdict/judgment non obstante veredicto* because Jamison did not present any

---

1. Neither Star Enterprises nor Motiva is a party.

2. We refer to the respondents collectively as Jamison in the opinion.

evidence of actual agency to support the vicarious liability verdicts?

2. Did the trial judge err in denying Mini Mart's motion for a directed verdict because there was no evidence of a sale of alcohol?

3. Did the trial judge err in failing to dismiss appellant John Morris from the suit?

4. Did the trial judge commit error in ruling that Dr. Crane's expert testimony was admissible thus requiring a new trial for Mini Mart?

## ANALYSIS

### 1. *Directed verdict/JNOV*

■ Anderson and Texaco each argue entitlement to a directed verdict or a JNOV contending there was no evidence that either entity had the right to control Mini Mart's alcohol sales, Mini Mart was therefore not their agent, and thus neither could be vicariously liable. The trial judge directed a verdict on Jamison's apparent agency claims, and submitted the case against Texaco and Anderson to the jury solely on the theory of actual agency.

■ Under South Carolina law:

The decisive test in determining whether the relation of master and servant exists is whether the purported master has the right or power to direct and control the servant in the performance of his work and in the manner in which the work is to be done. *Keitz v. National Paving & Contracting Co.,* 214 Md. 479, 134 A.2d 296 (1957); *see Fernander v. Thigpen,* 278 S.C. 140, 144, 293 S.E.2d 424, 426 (1982) ("The test to determine agency is whether or not the purported principal has the *right to control* the conduct of his alleged agent.") (Emphasis theirs); *Young v. Warr,* 252 S.C. 179, 189, 165 S.E.2d 797, 802 (1969) ("The general test applied is . . . whether there exists the right and authority to control and direct the particular work or undertaking, as to the manner or means of its accomplishment."); *DeBerry v. Coker Freight Lines,* 234 S.C. 304, 307–08, 108 S.E.2d 114, 116 (1959) ("The right or power of control retained by the person for whom the work is being done is uniformly

regarded as the essential criterion for determining whether the workman is an employee. . . .").

*Watkins v. Mobil Oil Corp.,* 291 S.C. 62, 65–66, 352 S.E.2d 284, 286 (Ct.App.1986).

In *Watkins,* a customer sued Mobil after he was assaulted by the gas station's assistant manager when the customer entered the station to purchase cigarettes. The station was operated by a franchisee, which controlled the station's operations, its employees, and its premises. The Court of Appeals held there was no evidence that Mobil, the franchisor, had the right to control the conduct of the business even though the employees wore Mobil uniforms and the station was Mobil-branded.

■ The key question here is whether Texaco and/or Anderson, as the jobber, has the right or power to direct the manner or means of the purported agent's work, that is, to control Mini Mart "in the performance of [its] work and the manner in which the work is to be done." *Id.; see also Young v. Warr,* 252 S.C. 179, 165 S.E.2d 797 (1969).

■■ In an actual agency case, the question is not whether the purported principal could have exercised control over its agent, but whether it did so. *Compare Glover v. Boy Scouts of America,* 923 P.2d 1383 (Utah 1996) (right to control must rest on facts as they exist, not speculation if different policies had been followed).[3] We begin by looking at the three documents which govern the parties' relationships: the Wholesaler Marketing Agreement between Motiva and Anderson, Texaco's Brand Standards, and a Mystery Shopper Program which checks on Mini Mart's compliance with Texaco's Brand Standards. Nothing in the agreement or the Standards creates, on its face, an agency-principal relationship here.

■ A franchisor is not the principal of a branded gas station franchisee for purposes of all tort liability. *Watkins, supra.* Moreover, a franchisor is not vicariously liable for a tort committed at an independent gas station unless the

---

**3.** We agree with appellants that "The Road Map to the Bottom Line" and "The Successful Alcohol Management Training Guide," both of which were created for use by Texaco-owned stations, are not relevant to the agency issue as neither document was provided to Mini Mart.

plaintiff can show that the franchisor exercised more control over the franchisee than that necessary to ensure uniformity of appearance and quality of services among its franchisees. *E.g., Kennedy v. Western Sizzlin Corp.,* 857 So.2d 71 (Ala. 2003); *Vandemark v. McDonald's Corp.* 153 N.H. 753, 904 A.2d 627 (2006); *Ciup v. Chevron U.S.A., Inc.,* 122 N.M. 537, 928 P.2d 263 (1996); *Pate v., Alian,* 49 P.3d 85 (Ok.Ct.App. 2002).

Texaco and Anderson contend that the Brand Standards are designed only to preserve Texaco's trademark and its goodwill. Jamison argues, however, that Texaco's requirements regarding employee appearance [4] and courtesy [5] are indicative of control over employees. *Compare, e.g., Sipple v. Starr,* 205 W.Va. 717, 520 S.E.2d 884 (1999) (jobber vicariously liable where he ordered owner to clean the store, redecorate, obtain a liquor license, and to fire an employee for having bad teeth); *Wood v. McDonald's,* 166 N.C.App. 48, 603 S.E.2d 539 (2004) (management company of franchisee liable where it hired, fired, and supervised personnel and controlled operations on a daily basis).

In addition to relying on the Brand Standards requirements for employees as proof of control beyond that ordinarily imposed by a franchisor, Jamison points to the Standards' requirements where a Texaco-branded station opts to sell merchandise. In such cases, the Standards require certain displays and hours of operation,[6] signage,[7] and that cleanliness and hygiene standards be maintained.[8]

---

**4.** E.g., they must be neat, clean, not have visible tattoos or wear excessive jewelry, and wear Texaco shirts and approved pants.

**5.** E.g., they must not smoke, eat, or listen to the radio in the sales counter area, must greet and thank all customers, must be behind counter and offer receipts.

**6.** The retail component is to be open 24 hours a day unless Texaco agrees to shorter hours, and Texaco credit card applications and other point of sale merchandise must be displayed in a specific space.

**7.** Legal notices must be displayed in back office, and only preapproved (printed not hand written) signs can be used in the retail area.

**8.** *E.g.,* coolers must be clean and kept between 34 and 38 degrees Fahrenheit, shelves must be stocked with in-date merchandise, and area must be kept clean and neat.

We find nothing in these requirements which supports a finding that Texaco or Anderson exercised control over the sale of food, beverages, or general merchandise by Mini Mart. As the parties acknowledge, Texaco did not require Mini Mart to sell alcoholic beverages, *compare Sipple, supra,* nor did Texaco or Anderson exercise any control over Mini Mart's decision to hire or fire employees. *Compare Wood, supra.* Neither Texaco nor Anderson offered Mini Mart any training material with regard to these types of sales. Rather, Mini Mart used training materials and seminars produced by the National Association of Convenience Stores in training its employees in the responsible sale of alcoholic beverages.

As noted above, Jamison argues we should find indicia of control over and above the typical franchisor-franchisee relationship in the use of the Mystery Shopper Program, and the fact that Mini Mart, like all Texaco-branded stations, was required to display a Texaco customer service number. Under the Mystery Shopper Program, branded stations were visited twice a year by an anonymous individual who purchased only gasoline and checked the premises for compliance with the Brand Standards in sixty-nine designated areas.[9] In our view, nothing in the Mystery Shopper Program exceeded the scope of the ordinary franchisor-franchisee relationship. *See, e.g., Schlotzky's, Inc. v. Hyde,* 245 Ga.App. 888, 538 S.E.2d 561 (2000) (franchisor's right to inspect or evaluate franchisee's compliance with standards and to debrand for noncompliance is not evidence of day-to-day control). Neither Texaco's requirement that Mini Mart participate in this program, nor Anderson's role as "enforcer," that is, the party responsible for informing Mini Mart of areas where the shopper found problems, is evidence of actual authority over Mini Mart's retail operation, particularly its sale of alcoholic beverages for off-premises consumption. Moreover, the required posting of the Texaco 800 number is in keeping with Texaco's desire to maintain consistency among its franchisees, and not

---

9. Among the items checked by the Mystery Shopper were whether the employees complied with the Brand Standards appearance requirements and courtesy standards, whether merchandise was properly priced and in-date, and whether the premises and exterior were clean and well-kept.

indicative of Texaco's control over Mini Mart's daily operations.

Finally, Jamison contends that because Mini Mart expended approximately $190,000 to bring its station into compliance with Texaco standards in order to retain the right to sell Texaco gasoline, Texaco exercised control sufficient to submit the issue of actual agency to the jury. In our view, this business decision by Mini Mart does not create an actual agency-principal relationship vis-à-vis alcoholic beverage sales.

We hold the trial judge erred in submitting the issue of Texaco's and/or Anderson's vicarious liability to the jury. We find no evidence to support a finding that either entity had the right or power to control Mini Mart in the performance of its retail alcoholic beverage sales or in the manner in which that work was done, and therefore reverse the verdicts against Texaco and Anderson, holding each was entitled to a directed verdict. *Watkins, supra; see also Allen v. Greenville Hotel Partners, Inc.,* 409 F.Supp.2d 672 (D.S.C.2006) (applying South Carolina law, court granted franchisor summary judgment finding through its agreement and brand standards franchisor was merely maintaining uniform standards and goodwill throughout the franchisor's system).

The remaining three issues are raised on appeal by Mini Mart.

### 2. *Directed verdict*

██ Mini Mart contends the trial judge erred in failing to direct a verdict in its favor because there was insufficient evidence that it sold beer to Carlos. The standard on appeal for reviewing the denial of a directed verdict is whether there is any evidence to support the jury's verdict. *Watkins, supra.* Here, there is testimony from Louis that the boys pooled their money, that Carlos Davis and another young man entered the Mini Mart with that money, and that they emerged with beer. There was also testimony from a police officer that one of the passengers in the wrecked automobile told him that the boys had purchased beer from that convenience store. The trial judge properly denied this directed verdict motion because there was evidence that Mini Mart sold beer to the underage boys. *Watkins, supra.*

### 3. *Dismissal of John Morris from the suit*

 Mini Mart contends the trial court erred in failing to direct a verdict or grant a JNOV motion for John Morris, one of the owners of the Mini Mart. This request is predicated on the testimony of John's son, Kevin, that he bought out his father's interest in the business in 1992, well before the alleged sale in 2000. This issue was not raised as a ground for a directed verdict during the liability stage of the trial and is not preserved for this Court's review. *E.g., In re McCracken,* 346 S.C. 87, 551 S.E.2d 235 (2001) (only grounds raised in directed verdict can be raised in JNOV motion). Moreover, while Kevin testified that he owned the station, he also testified that the business was owned by his family.

### 4. *New trial*

 Mini Mart contends the trial court erred in admitting expert testimony from Dr. Crane concerning Carlos Davis's probable level of impairment at the time of the accident because that opinion was predicated on what the trial judge deemed an unreliable blood alcohol level (BAL) test conducted by S.L.E.D. We agree.[10]

The S.L.E.D. analysis used a blood sample drawn at the hospital approximately one hour and fifty minutes after the accident. The sample was drawn to type blood, but the hospital did no testing as Carlos died shortly after the sample was drawn. The sample was released to the Richland County Coroner's office on April 3, two days after the accident. It was delivered to S.L.E.D. for testing on April 4. The S.L.E.D. testing came about at the request of the officer who had investigated the accident, after he learned from a passenger that the beer had allegedly been illegally sold to Carlos by Mini Mart.

---

10. We do not reach two other issues raised by Mini Mart regarding Dr. Crane's testimony. First, we find no objection which properly preserved the question of Dr. Crane's qualification as an expert. *E.g., Harris v. Campbell,* 293 S.C. 85, 358 S.E.2d 719 (Ct.App.1987). Second, we disagree that whether Carlos was impaired by alcohol at the time of the accident is an improper subject for expert testimony. *E.g., Mizell v. Glover,* 351 S.C. 392, 570 S.E.2d 176 (2002) (decision to admit expert testimony is subject to clear abuse of discretion standard on appeal).

At trial, the trial judge held that Jamison had not been able to prove a chain of custody "insofar as was practicable." He subsequently held Dr. Crane could testify in reliance on the result of the S.L.E.D. test, but not as to the result itself. Before the jury, Dr. Crane opined that Carlos' BAL at the time of the accident was 0.193. Mini Mart contends that once the trial judge found that Jamison was unable to present a "good" chain of custody as to the blood tested by S.L.E.D., he erred in allowing any evidence predicated on the testing of that sample. We agree.

In *Ex parte DHEC*, 350 S.C. 243, 565 S.E.2d 293 (2002), the Court was asked whether the State could use an individual's HIV record from testing done at DHEC, at the individual's request, in the individual's criminal prosecution for knowingly transmitting HIV to another person. The Court held the DHEC record was admissible as a business record under Rule 803(6), SCRE, even though there was no chain of custody. The Court held that the lack of a chain was not determinative of admissibility because the trustworthiness of medical records is presumed and that test results, including BAL test results, done for purposes of medical treatment are admissible without a chain. The Court emphasized the reliability of a test done for medical purposes, but also held:

> A person charged with DUI based on a blood alcohol test taken at the time of his arrest has no such protection and, therefore, needs the indica of reliability provided by a chain of custody.

*Ex parte DHEC*, 350 S.C. at 250–251, 565 S.E.2d at 297.

Here, we have a situation where a sample was drawn at a hospital for medical purposes but never tested. Had the hospital performed Carlos' BAL test as part of its medical treatment of him, the results would have been a part of Carlos' medical record. Under *Ex parte DHEC*, those results would be presumed reliable as a business record regardless of a chain of custody. The fact that the BAL test was performed not for medical purposes necessitates that the proponent be able to demonstrate a chain of custody insofar as practicable in order for the results to be deemed reliable. *Id.* Without that showing, the test performed by S.L.E.D. on a sample drawn but not tested for medical purposes, is unreliable. *Ex*

*parte DHEC, supra; see also S.C. Dep't of Soc. Servs. v. Cochran* 356 S.C. 413, 589 S.E.2d 753 (2003) (drug test results inadmissible where no complete chain of custody shown); *Gulledge v. McLaughlin,* 328 S.C. 504, 492 S.E.2d 816 (Ct. App.1997) (BAL results admitted where chain of custody had "irregularities" but was complete); *Benton v. Pellum,* 232 S.C. 26, 100 S.E.2d 534 (1957) (BAL done by one hospital for purposes of litigation on blood drawn by another hospital excluded because no complete chain of custody could be shown); *Graham v. State,* 253 Ind. 525, 255 N.E.2d 652 (1970) (if chain is incomplete, the evidence cannot be introduced or made the basis for the testimony or report of an expert).

▆▆▆ Under Rule 703, SCRE, an expert may rely on inadmissible evidence if the trial judge "examines the reliability of the inadmissible evidence and excludes opinions not deserving of reliance in the specific instance and/or those that rely on grossly unreliable data." Kaye, Bernstein and Mnookin, The New Wigmore: Expert Evidence § 3.6.1 a (2004). Under South Carolina law, unless a test is conducted for medical purposes, the result of that test is not reliable unless the proponent can demonstrate a chain of custody. *Ex parte DHEC, supra.*

▆▆▆ All expert testimony must meet a reliability threshold under Rule 702, SCRE, which imposes an affirmative and meaningful gatekeeper function on the trial judge. *State v. White,* 382 S.C. 265, 676 S.E.2d 684 (2009). Here, the trial judge performed this duty and held that the S.L.E.D. result was not reliable because he found that Jamison did not prove a chain of custody insofar as practicable. Having made that finding, the judge erred in allowing Dr. Crane to give an opinion based on that result. An expert cannot testify to an opinion predicated on an unreliable test.

▆▆▆ *In camera,* Dr. Crane opined that Carlos' BAL had been 0.193 when the crash occurred based upon the S.L.E.D. analysis which tested the sample at 0.168. Dr. Crane also opined as to Carlos' BAL at the time of the accident without reference to the S.L.E.D. test, using Louis' deposition and that of another young man who was a passenger in the car with them that day. Without the S.L.E.D. test, Dr. Crane

opined that Carlos' BAL would have been between 0.046 and 0.114.

Jamison chose to present only the higher S.L.E.D.-based BAL estimate when it examined Dr. Crane before the jury. Jamison argues on appeal that even if Dr. Crane's testimony should not have been allowed to the extent it rested on the S.L.E.D. test, any error was harmless since there was other evidence upon which Dr. Crane could base his opinion that Carlos was intoxicated. While certainly Dr. Crane presented such testimony in his proffer, before the jury Jamison relied solely on the S.L.E.D.-based extrapolation of 0.193. The evidence, other than that of Dr. Crane, that Carlos was intoxicated was not so overwhelming that we are able to conclude that the admission of Dr. Crane's testimony was harmless error here. Mini Mart is therefore entitled to a new trial.[11]

## CONCLUSION

We hold that Texaco and Anderson are entitled to a directed verdict, and that Mini Mart is entitled to a new trial. The jury verdict on appeal is

**REVERSED.**

WALLER, Acting Chief Justice, BEATTY, KITTREDGE, JJ., and Acting Justice JAMES E. MOORE, concur.

---

11. We do not foreclose the possibility that, on retrial, Jamison will be able to satisfy the requirement that a chain of custody be shown insofar as practicable. *See Hosford v. Wynn,* 26 S.C. 130, 1 S.E. 497 (1887) (all questions are reopened upon a new trial).