# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Adam Rowell, Appellant.

Appellate Case No. 2018-000022

---

Appeal From Greenwood County
Donald B. Hocker, Circuit Court Judge

---

Opinion No. 5832
Heard September 22, 2020 – Filed July 21, 2021
Previously Withdrawn, Substituted and Refiled August 25, 2021
Withdrawn, Substituted, and Refiled March 02, 2022

---

## AFFIRMED

---

Billy J. Garrett, Jr., of The Garrett Law Firm, PC, Carson McCurry Henderson, of The Henderson Law Firm, PC, Jane Hawthorne Merrill, of Hawthorne Merrill Law, LLC, and Clarence Rauch Wise, all of Greenwood, all for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General Jonathan Scott Matthews, both of Columbia, and Solicitor David Matthew Stumbo, of Greenwood, all for Respondent.

---

**LOCKEMY, A.J.:** Adam Rowell appeals his convictions for felony driving under the influence (DUI) resulting in death and felony DUI resulting in great bodily

injury.  On appeal, Rowell argues the trial court abused its discretion in admitting blood samples into evidence without the proper chain of custody and because the samples were taken (1) after 50% of Rowell's blood volume was replaced, and (2) after 150% of Rowell's blood volume was replaced.  Rowell also asserts the trial court erred in failing to conduct an evidentiary hearing with a juror who failed to disclose his pending criminal charges during voir dire.  We affirm.

## FACTS/PROCEDURAL HISTORY

On November 15, 2014, Rowell was in a head-on automobile accident, which seriously injured Matthew Sanders and killed Jeremy Cockrell.  Cockrell was driving a red pickup truck with Sanders in the passenger seat, and Rowell was in a dark blue pickup truck.  Following the collision, Rowell was indicted for felony DUI resulting in death and felony DUI resulting in great bodily injury.

During voir dire, the trial court asked, "[Has] any member of the jury panel or any member of your immediate family members or close personal friends ever been arrested and charged with any criminal offense through whatever state, local or federal law enforcement agency?"  The trial court asked another nine questions before asking the jurors to approach the bench if any of the questions applied to them.  Juror 164 did not respond and was seated on the jury.

At trial, Sanders testified he and Cockrell were driving to Greenwood when Rowell's truck crashed into them.  Cockrell died from blunt force trauma at the scene.  Officer Kelly Anderson, a member of the Multidisciplinary Accident Investigation Team (MAIT), explained the collision occurred because Rowell's truck drifted into Cockrell's lane.  According the MAIT investigation, one second prior to the collision, Rowell was traveling at sixty-nine miles per hour and Cockrell's truck was traveling at twenty-four miles per hour.

Emergency responders testified they could smell alcohol when they arrived. Open and unopened beers were in Rowell's truck, spilled alcohol was on Rowell's floorboard, and multiple beer cans were on the ground near the collision.  Rowell, who was also seriously injured in the collision, received 2000 milliliters of intravenous (IV) fluid and a 500 milliliter blood transfusion on site, and was airlifted to Greenville Memorial Hospital.  The flight records show the helicopter arrived at the hospital at 8:59 p.m.

The trial court held an in camera chain of custody hearing to address whether blood drawn from Rowell when he arrived at the hospital (Sample A) was admissible.  Angela Waites, the flight nurse, stated it took twenty-four minutes to

get Rowell to Greenville Memorial Hospital.  She testified she observed Amanda Baker, an emergency room (ER) nurse, draw Sample A and believed it was drawn from Rowell's right arm because Baker was standing on Rowell's right-hand side.

Nurse Baker testified she did not recall Rowell as a patient because she cares for and draws blood samples from hundreds of patients.  She explained that Rowell's medical documentation indicated Dr. Bradley Snow took Sample A from a central line and handed it to her.  Nurse Baker testified that after blood is drawn from a central line, a technician takes it to the lab.  Bill Evans was the technician listed on the medical records.  Rowell's medical records indicated his blood was drawn at 9:08 p.m.; however, the hospital's audit trail indicated it was drawn at 8:54 p.m.

Robert Smith, the lab technician at Greenville Memorial Hospital, testified that according to the audit trail for Sample A, he received it in the lab at 9:24 p.m. Smith did not remember receiving this sample specifically because of the large number of specimens he regularly tested.  He testified it was hospital policy to hand-deliver ER specimens to the lab and test them right away.

Dr. John Reddic, an expert in clinical chemistry from Greenville Memorial Hospital, testified the hospital's audit trail showed Nurse Baker drew Sample A and Robert Smith received it for testing.  According to Reddic, Sample A showed a blood alcohol concentration (BAC) between .175 and .189.  Dr. Reddic noted Sample A was controlled and handled within the hospital's normal protocol.

Rowell argued the conflicting time reports in the medical records suggested there were two separate blood draws, one at 8:54 p.m. and one at 9:08 p.m.  However, the State asserted there was only one audit trail for blood and the records did not reflect a second draw.  The trial court ruled the State established the chain of custody, the audit trail reflected an 8:54 p.m. blood draw, and a discrepancy in the notation of the time of the blood draw did not render the evidence inadmissible. During trial, the relevant medical witnesses testified similarly to their in camera testimony.

Dr. Reddic testified that a "clock slop" time discrepancy of several minutes can occur where records have been created based on clocks that were not synced.  He also explained there is a lag time between when a doctor orders a blood draw, the drawing of the blood, and the subsequent transport of the blood draw to the lab, and "thirty minutes is appropriate."

Dr. Snow, Rowell's surgeon, testified that during surgery, Rowell received 3,150 milliliters of blood, 360 milliliters of plasma, 3,000 milliliters of saline, and 3,000

milliliters of Plasma-Lyte. He stated 53% of Rowell's blood was replaced and he would have died without the transfusion.

After Rowell's surgery, Officer Smith acquired a search warrant for Rowell's blood (Sample B). Rowell objected to the admission of Sample B, arguing that when it was taken, 52% of his blood had been replaced and a BAC test of that blood would be unreliable. The trial court held another in camera hearing.

Dr. Jimmie Valentine, a defense expert, testified that when Sample B was drawn from Rowell, he had received fluids that totaled 161.7% of his blood volume. He explained Sample B was not an accurate indication of what Rowell's blood was like during the collision. He stated that "any value that one would find or try to attach to [Sample B] has very little scientific meaning because of th[e] volume that [went] into him." Dr. Valentine explained Sample B included 4.9 milligrams per liter of Benadryl, which was a toxic dose, and Rowell's medical records indicated the hospital did not give him Benadryl. Further, he explained Sample B had acetones, which was indicative of someone who was diabetic and Rowell's medical records did not indicate he had diabetes. Dr. Valentine testified the methodology and science used in the BAC testing was reliable; however, he questioned the validity of the results.

Dr. Valentine stated the BAC from Sample B was consistent with Rowell's blood having been diluted by transfusions. He explained a person with a BAC of .18 would normally have a BAC of .12 after four hours and that the dilution of the blood due to a transfusion could explain why Sample B's BAC was .09. Dr. Valentine agreed that Sample B would have included a percentage of Rowell's blood that had remained in his system after the transfusion.

The trial court held that because Dr. Valentine did not attack the validity of the methodology of the test, Sample B was admissible. Specifically, the trial court clarified it did not find the results reliable, only that the methodologies and procedures used in the testing were reliable.

Rowell testified he did not have diabetes, nor did he use Benadryl. He stated he drank twenty-four ounces of beer approximately four hours before the accident. The jury convicted Rowell of felony DUI resulting in death and felony DUI resulting in great bodily injury. The trial court sentenced him to thirteen years' imprisonment. After trial, Rowell learned Juror 164 had been arrested and charged with a crime in Greenwood County shortly before his trial. Rowell moved for a new trial, arguing—among other things—that Juror 164 failed to disclose his arrest

during voir dire. However, Rowell did not request that the trial court conduct an evidentiary hearing.

At the hearing on Rowell's motion for a new trial, he argued he would not have seated Juror 164 on the jury had he known of his arrest because the juror could have had an incentive to help the State. Rowell stated he did not contact Juror 164 because Juror 164 was represented by counsel, who told them Juror 164 would not be speaking with them. Rowell did not request a separate evidentiary hearing on the juror issue and did not subpoena Juror 164. Following the hearing and before the trial court issued an order, Rowell sent an email to the trial court requesting a hearing with the juror.

The trial court denied Rowell's motion for a new trial. The trial court stated that on its face, the question asked during voir dire was comprehensible to the average juror; however, the court noted that it was the first of ten questions the juror had to remember and the amount of time between question and answer "could be confusing to the average juror." The trial court further opined because an arrest is a public arrest record, the juror did not conceal his arrest. This appeal followed.

## ISSUES ON APPEAL

1. Did the trial court err by admitting Sample A into evidence because the chain of custody was insufficient?

2. Did the trial court err by admitting Sample A into evidence because 50% of Rowell's blood had been replaced when Sample A was taken?

3. Did the trial court err by admitting Sample B into evidence because 150% of Rowell's blood had been replaced when Sample B was taken and the sample contained Benadryl and acetones?

4. Did the trial court err by failing to conduct an evidentiary hearing regarding a juror who failed to disclose his pending criminal charges?

## STANDARD OF REVIEW

"In criminal cases, appellate courts sit to review errors of law only . . . ." *State v. Robinson*, 410 S.C. 519, 526, 765 S.E.2d 564, 568 (2014). "Because the admission of evidence is within the sound discretion of the trial court, appellate courts should not reverse the decision of the trial court absent an abuse of discretion." *Id*. "The

denial of a motion for a new trial will not be reversed absent an abuse of discretion." *State v. South*, 310 S.C. 504, 507, 427 S.E.2d 666, 668 (1993).

## LAW/ANALYSIS

### I. Chain of Custody for Sample A

Rowell argues the inconsistency between the time that he landed at Greenville Memorial Hospital and the time Sample A was taken established it was factually impossible for Sample A to be Rowell's blood. He asserts the chain of custody was not complete because Bill Evans walked Sample A from Nurse Baker to the lab but never testified. Rowell also asserts an unidentified person brought the blood from the ER to the lab and the sample was unaccounted for during a period of thirty minutes. We disagree.

Our supreme court has held, "a party offering into evidence fungible items such as drugs or blood samples must establish a complete chain of custody as far as *practicable*." *State v. Pulley*, 423 S.C. 371, 377, 815 S.E.2d 461, 464 (2018) (emphasis added) (quoting *State v. Hatcher*, 392 S.C. 86, 91, 708 S.E.2d 750, 753 (2011)). "Courts have abandoned inflexible rules regarding the chain of custody and the admissibility of evidence in favor of a rule granting discretion to the trial courts." *Hatcher*, 392 S.C. at 94, 708 S.E.2d at 754.

Our supreme court has stated it has "never held the chain of custody rule requires every person associated with the procedure be available to testify or identified personally, depending on the facts of the case." *Id.* at 93, 708 S.E.2d at 754 (quoting *S.C. Dep't of Soc. Servs. v. Cochran*, 364 S.C. 621, 629, 614 S.E.2d 642, 646 (2005)). "[W]e have consistently held that the chain of custody need be established only as far as practicable, and we reiterate that every person handling the evidence need not be identified in all cases." *Id.* at 95, 708 S.E.2d at 755.

"Whether the chain of custody has been established as far as practicable clearly depends on the unique factual circumstances of each case." *Id.* at 94, 708 S.E.2d at 754 (quoting *Cochran*, 364 S.C. at 629 n.1, 614 S.E.2d at 646 n.1). "The trial [court's] exercise of discretion must be reviewed in the light of the following factors: '. . . the nature of the article, the circumstances surrounding the preservation and custody of it, and the likelihood of intermeddlers tampering with it." *Id.* at 94-95, 708 S.E.2d at 754-55 (omission in original) (quoting *United States v. De Larosa*, 450 F.2d 1057, 1068 (3d Cir. 1971)).

"In examining issues regarding the chain of custody, a mere suggestion that substitution could possibly have occurred is not enough to establish a break in the chain of custody." *Id.* at 94, 708 S.E.2d at 754.

We hold the trial court did not err in admitting Sample A. During the in camera hearing, the State presented evidence that (1) Sample A was drawn by Dr. Snow via a central line; (2) it was handed to Nurse Baker; (3) Bill Evans was on duty and walked Sample A to the lab, and (4) Robert Smith, the lab technician, received the blood and facilitated the testing. This evidence identified who was in possession of Sample A. Although Evans did not testify and most of the witnesses in the chain did not recall these specifics, the State established through testimony and documentation Sample A's chain of custody as far as practicable given the circumstances.

Further, the circumstances surrounding the preservation and custody of Sample A diminished the likelihood it was tampered with. *See Hatcher*, 392 S.C. at 94-95, 708 S.E.2d at 754-55 ("The trial [court's] exercise of discretion must be reviewed in the light of the following factors: . . . the nature of the article, the circumstances surrounding the preservation and custody of it, and the likelihood of intermeddlers tampering with it." (omission in original) (quoting *De Larosa*, 450 F.2d at 1068)). Here, Sample A was collected for medical purposes to save Rowell's life and not for any investigative purpose, which makes it unlikely it was tampered with. *Id.* at 95, 708 S.E.2d at 755 ("The ultimate goal of chain of custody requirements is simply to ensure that the item is what it is purported to be."); *cf. Ex parte Dep't of Health & Envtl. Control*, 350 S.C. 243, 250, 565 S.E.2d 293, 297 (2002) ("The trustworthiness of medical records is presumed, based on the fact that the test is relied on for diagnosis and treatment.").

As to the timing of the draw for Sample A, the inconsistency within the medical records and flight records regarding the landing time and the time of the blood draw did not establish either a break in the chain of custody or that the blood was from someone else. The factual circumstances of this case reflect that the exact syncing of times between medical and flight personnel records was unlikely. A brief time discrepancy between organizations does not alter the chain of custody analysis because each person who possessed the sample was identified. *See Hatcher*, 392 S.C. at 94, 708 S.E.2d at 754 ("Whether the chain of custody has been established as far as practicable clearly depends on the unique factual circumstances of each case." (quoting *Cochran*, 364 S.C. at 629 n.1, 614 S.E.2d at 646 n.1)); *State v. Patterson*, 425 S.C. 500, 508, 823 S.E.2d 217, 222 (Ct. App. 2019) ("Minor discrepancies in the chain of custody implicates the credibility of the evidence, but does not render the evidence inadmissible."). This discrepancy,

as well as the discrepancy of thirty minutes between drawing the blood and delivery to the lab, goes to the weight and credibility of the evidence, not its admissibility. *See State v. Johnson*, 318 S.C. 194, 196, 456 S.E.2d 442, 444 (Ct. App. 1995) (holding a two-day discrepancy in the chain of custody regarding the dates an investigator turned in drug evidence to the evidence custodian did not establish the drugs were inadmissible); *id.* ("A reconciliation of this [two-day] discrepancy was not necessary to establish the chain of custody, but merely reflected upon the credibility of the evidence rather than its admissibility."). Therefore, the trial court did not abuse its discretion in admitting Sample A into evidence.[1]

## II.     Blood Transfusion and Testing of Sample A

Rowell argues the trial court erred in admitting Sample A into evidence because roughly half his blood was replaced with liquids prior to the hospital's blood draw. He asserts the State failed to establish the reliability of the BAC test after he received a transfusion. We find this issue unpreserved for our review.

Rowell never raised to the trial court the issue that a blood transfusion caused Sample A's BAC testing results to be unreliable. At trial, Rowell extensively challenged the chain of custody for Sample A; however, he never objected to Sample A's admission on the basis that the test was unreliable because he had previously received 500 milliliters of blood and 2000 milliliters of IV fluids. Thus, this issue was not preserved for appellate review because this argument was not raised to and ruled on by the trial court. *See State v. Dunbar*, 356 S.C. 138, 142,

---

[1] The State argues the trial court did not err in admitting Sample A into evidence based on our supreme court's opinion in *Jamison v. Morris*, 385 S.C. 215, 227, 684 S.E.2d 168, 174 (2009) (stating that when a blood sample is drawn at a hospital for medical purposes as part of its medical treatment of a patient, the results would have been a part of the patient's medical record and presumed reliable as a business record regardless of a chain of custody). Although we acknowledge the State submitted a supplemental citation to *Jamison* prior to oral argument and raised this argument in its petition for rehearing, the State did not raise this argument to trial court or in its appellate brief. Thus, we decline to address this argument on the merits. *See I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000) ("Of course, a respondent may abandon an additional sustaining ground . . . by failing to raise it in the appellate brief."); *see also* Rule 208(b)(1)(B), SCACR ("Ordinarily, no point will be considered which is not set forth in the statement of the issues on appeal.").

587 S.E.2d 691, 693-94 (2003) ("In order for an issue to be preserved for appellate review, it must have been raised to and ruled upon by the trial [court]. Issues not raised and ruled upon in the trial court will not be considered on appeal.").

## III.    Blood Transfusion and Testing of Sample B

Rowell argues the trial court erred in admitting Sample B into evidence because more than 150% of his blood had been replaced by blood and other fluids before Sample B was drawn. Even if the admission of Sample B was so unreliable that its admission was error, this error was harmless. The jury received clear evidence of Rowell's intoxication from Sample A, the evidence of open containers in his truck, the alcohol spilled on the floor of his truck, and testimony that his breath smelled of alcohol at the accident scene. *See State v. Black*, 400 S.C. 10, 27, 732 S.E.2d 880, 890 (2012) ("An appellate court generally will decline to set aside a conviction due to insubstantial errors not affecting the result."); *State v. Howard*, 296 S.C. 481, 485, 374 S.E.2d 284, 286 (1988) ("Where guilt is conclusively proven by competent evidence and no rational conclusion can be reached other than that the accused is guilty, a conviction will not be set aside because of insubstantial errors not affecting the result.").

## IV.    Juror Concealment

Rowell argues the trial court erred in denying his request for an evidentiary hearing as to Juror 164's failure to disclose his pending criminal charges during voir dire. Rowell asserts the trial court abused its discretion in failing to hold a hearing because without such hearing, the trial court could not determine the basis for Juror 164's failure to answer truthfully. We disagree.

> When a juror conceals information inquired into during voir dire, a new trial is required only when the court finds the juror intentionally concealed the information, and that the information concealed would have supported a challenge for cause or would have been a material factor in the use of the party's peremptory challenges.

*State v. Woods*, 345 S.C. 583, 587, 550 S.E.2d 282, 284 (2001). "Whether a juror's failure to respond is intentional is a fact intensive determination that must be made on a case-by-case basis." *State v. Sparkman*, 358 S.C. 491, 496, 596 S.E.2d 375, 377 (2004). "The inquiry must focus on the character of the concealed information, not on the mere fact that a concealment occurred." *State v. Kelly*, 331

S.C. 132, 147, 502 S.E.2d 99, 106 (1998) (quoting *Thompson v. O'Rourke*, 288 S.C. 13, 15, 339 S.E.2d 505, 506 (1986)). "If the court finds no intentional concealment occurred, the inquiry ends there." *Lynch v. Carolina Self Storage Ctrs., Inc.*, 409 S.C. 146, 155, 760 S.E.2d 111, 116 (Ct. App. 2014).

In *Woods*, our supreme court held,

> intentional concealment occurs when the question presented to the jury on voir dire is reasonably comprehensible to the average juror and the subject of the inquiry is of such significance that the juror's failure to respond is unreasonable. Unintentional concealment, on the other hand, occurs where the question posed is ambiguous or incomprehensible to the average juror, or where the subject of the inquiry is insignificant or so far removed in time that the juror's failure to respond is reasonable under the circumstances.

345 S.C. at 588, 550 S.E.2d at 284.

We find the trial court did not abuse its discretion in failing to conduct an evidentiary hearing with Juror 164. *See South*, 310 S.C. at 507, 427 S.E.2d at 668 ("The denial of a motion for a new trial will not be reversed absent an abuse of discretion."). Nothing required the trial court or a party to hail a juror into court to testify on the issue of juror misconduct under the circumstances presented here. *See State v. Aldret*, 333 S.C. 307, 315, 509 S.E.2d 811, 815 (1999) (holding the trial court may, in its discretion, consider juror affidavits on the issue of premature jury deliberations and if the trial court finds the affidavits credible and indicative of misconduct it should hold an evidentiary hearing to assess whether such deliberations occurred); *Lynch*, 409 S.C. at 159 n.2, 760 S.E.2d at 119 n.2 (noting "a trial court is not obligated to take juror testimony when the court determines it can rule" on the misconduct issue without it); *id.* at 155, 760 S.E.2d at 166 (stating "[i]f the court finds no intentional concealment occurred, the inquiry ends there"). In *Woods*, our supreme court rejected a juror's testimony as to why her failure to respond to two questions asked during voir dire was unintentional. 345 S.C. at 589-90, 550 S.E.2d at 285. There, the juror failed to disclose that she worked as a volunteer victims' advocate for the prosecuting solicitor's office and testified during an evidentiary hearing that she either did not hear the questions asked during voir dire or did not realize they applied to her. *Id.* at 585-87, 550 S.E.2d at 283-84. Despite this testimony, our supreme court found the juror's failure to respond was intentional because the questions at issue "were reasonably

comprehensible and should have elicited a positive response from [the j]uror." *Id.* at 589-90, 550 S.E.2d at 285.

Here, after reviewing the voir dire proceedings with the court reporter to ensure it correctly recalled the sequence of events, the trial court concluded that the question, although straightforward when viewed in isolation, was presented in a way that could be confusing to the average juror. The trial court therefore concluded Juror 164's failure to disclose his pending criminal charges was unintentional. Because the trial court's conclusion was based upon its own observations of voir dire, the record supports the trial court's conclusion, and Juror 164's testimony was not necessary for the trial court to rule on the issue. Thus, we find the trial court did not err in failing to conduct an evidentiary hearing and did not abuse its discretion in denying Rowell's motion for a new trial based on Juror 164's concealment.

**CONCLUSION**

Based on the foregoing, we find the trial court did not err in admitting Sample A into evidence and any potential error as to Sample B was harmless. Further, we find the trial court did not abuse its discretion in denying Rowell's motion for a new trial based on Juror 164's concealment. Accordingly, Rowell's convictions are

**AFFIRMED.**

**KONDUROS and MCDONALD, JJ., concur.**